**NABISCO, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 718, Docket 72-2073.

United States Court of Appeals, Second Circuit.

Argued May 4, 1973.

Decided June 20, 1973.

---

Wesley J. Fastiff, San Francisco, Cal. (Littler, Mendelson & Fastiff, San Francisco, Cal., on the brief), for petitioner.

Charles N. Steele, Washington, D. C. (Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick. Hardin, Associate Gen. Counsel, Elliott Moore, Acting Asst. Gen. Counsel, Stanley R. Zirkin, Atty., N. L. R. B., on the brief), for respondent.

Before FRIENDLY and HAYS, Circuit Judges, and JAMESON, District Judge.*

HAYS, Circuit Judge:

This is a petition for review of an order of the National Labor Relations Board declining to decide a contractual dispute pending submission of the dispute to the grievance procedure prescribed by the parties in their collective bargaining agreement while retaining jurisdiction to act in the event that the dispute is not resolved. We deny the petition for review.

The petitioner, Nabisco, Inc., is engaged in the manufacture, distribution and sale of cookies, crackers and related products. Nabisco has a warehouse and distribution facility at Emeryville, California, where it employs eleven drivers to deliver Nabisco's bakery products to various retail stores, military installations, and other outlets in Alameda, Contra Costa, Sonoma, Mendocino, and Lake Counties in California. These drivers are represented by the Brotherhood of Teamsters & Auto Drivers Local No. 70, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America.

Besides delivering the bakery products, the driver is responsible for having the customer sign for the merchandise or for collecting payment in the form of cash or check. Approximately twenty per cent of Nabisco's customers pay for their purchases at the time of delivery by either cash or check. Cash payments amount to from five to ten per cent of the total dollar value of all deliveries. The drivers for Nabisco collected such payments for over 20 years and the practice was recognized in the collective bargaining agreement between the Union and the Company. Article 47 of the agreement states:

"Section 3. Money Receipt

"Employees handling money shall account for and remit to the employer monies so collected at completion of the days' work. The employer shall give the employee a receipt for the monies so paid in or the employee will not be held responsible for the money."

In April, 1969. as a result of the increased number of robberies and as-

---

* Of the United States District Court for the District of Montana, sitting by designation.

saults on delivery drivers in the Oakland and East Bay areas, the Oakland Police Department sent a letter [1] to the Truck Drivers Local suggesting various precautions to avoid such crimes. Among these suggestions was a recommendation that the drivers not carry large sums of money. The Union sent copies of the letter to Nabisco and its competitors, and in subsequent meetings with Nabisco requested the company to adopt a no-cash collection policy. Two of Nabisco's competitors with whom the Union had collective bargaining agreements agreed to adopt a no-cash policy. Nabisco refused to adopt the policy, contending that both parties were bound by the collective bargaining agreement which authorized the cash collection policy. Nabisco indicated that it would take certain other safety precautions, such as installing safes and wire mesh tailgates on the delivery trucks. Nabisco claimed these methods had proved successful in other areas and argued that to adopt a no-cash collection policy would put it at a substantial competitive disadvantage. The Union rejected the Company's proposal.

On July 16, 1969 the Union informed Nabisco that the drivers would no longer collect cash. However in fact when company officials told the drivers that it would be a violation of the contract to refuse to collect, the drivers continued the practice of collecting. Subsequently, on September 11, at a meeting of the drivers of three companies, including Nabisco, the drivers voted to refuse to make any more cash collections. After this vote, and after another unrelated strike against Nabisco had ended, the drivers, with two exceptions,[2] refused to collect cash.

On November 10, 1969, the Company filed a charge with the National Labor Relations Board claiming that the Union's actions constituted a unilateral

change in the contract in violation of Section 8(b)(3) of the National Labor Relations Act. Later the Company also charged that the Union in threatening the drivers violated Section 8(b)(2) and (1)(a) of the Act. The trial examiner found that the Union had violated the above sections of the Act. The National Labor Relations Board, without passing on the findings of the trial examiner, decided by a three to two vote to defer action on the Company's claim until the parties had pursued the grievance procedures set out in the collective bargaining agreement.

The agreement provides that grievances affecting the relations of the employer and the union shall first be taken up between the local union and the employer involved. If they fail to resolve the grievance, it is to be reduced to writing by the grieving party and referred to a joint labor management committee. This committee is composed of an equal number of union and management representatives. If this committee decides the grievance by majority vote, the result is binding on the parties. If the committee deadlocks it can by majority vote submit the dispute to arbitration. If the committee is unable to reach a majority vote on arbitration the parties are free to use economic measures to resolve the dispute, including a strike or lockout.

■ The petitioner contends that the decision of the majority of the Board in the instant case to defer consideration of the unfair labor practice issues until the grievance procedure agreed upon by the parties has been utilized contravenes the policies of the National Labor Relations Act. We disagree.

Section 1 of the Act indicates the importance of "encouraging practices fundamental to the friendly adjustment of industrial disputes." Section 203(d)

1. This letter noted that more than 25 armed robberies of delivery vehicles had occurred in Oakland in the first three months of 1969.

2. One driver continued to collect cash for only two days and the other stopped the collection of cash on November 19.

also points to the desirability of dispute settlement through the procedure set up by the parties.

"Final adjustment by a method agreed upon by the parties is hereby declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective bargaining agreement."

The petitioner contends that the Board should defer only when the dispute settlement technique adopted by the parties involves mandatory arbitration. We do not read the policy underlying the Act, as expressed in the legislative history, so narrowly. As the Senate Report stated, the Board would

"develop . . . a policy of entertaining under these provisions only such cases alleging violation of contract as cannot be settled by resort to the machinery established by the contract itself, voluntary arbitration or if necessary, by litigation in court. . . . Any other course would engulf the Board with a vast number of petty cases that could best be settled by other means. In short, the intention of the committee in this regard is that cases of contract violation be entertained on a highly selective basis, when it is demonstrated to the Board that alternative methods of settling the dispute have been exhausted or are not available."

S.Rep.No.105; 80th Cong., 1st Sess. p. 23, I Legislative History of the Labor Management Relations Act of 1947, p. 429.

In furtherance of this legislative policy the Board has decided that it should not "assume the role of policing collective contracts between employers and labor organizations by attempting to decide whether disputes as to the meaning and administration of such contracts constitute unfair labor practices under the

Act." Consolidated Aircraft Corp., 47 NLRB 694, 706 (1943), enf'd in pertinent part, 141 F.2d 785 (9th Cir. 1944).

The Board has "considerable discretion to . . . decline to exercise its authority . . . if to do so will serve the fundamental aims of the [National Labor Relations] Act." Carey v. Westinghouse Electric Corp., 375 U.S. 261, 271, 84 S.Ct. 401, 409, 11 L.Ed.2d 320 (1963), quoting International Harvester Co., 138 NLRB 923, 925–26. As the Supreme Court said in Smith v. Evening News Ass'n, 371 U.S. 195, 198 n. 6, 83 S.Ct. 267, 269, 9 L.Ed.2d 246 (1962) the Board has declined to act "where, in its judgment, federal labor policy would best be served by leaving the parties to other processes of the law." We cannot say that the Board abused its discretion in the present case in reaching the conclusion that federal labor policy would be furthered by giving the grievance procedure a chance to work, while retaining jurisdiction to step in if it did not.[3]

Petition denied.

---

3. We do not believe the Board's previous decisions in Tulsa-Whisenhunt Funeral Homes, Inc., 195 N.L.R.B. No. 20 (1972), and District No. 10, Int'l Ass'n of Machinists, 200 N.L.R.B. 165 (1972), were in any way inconsistent with the position it has taken here. In both those cases, the grievance procedures were at an end unless the parties themselves were willing to enter into an *ad hoc* arrangement for arbitration of their disputes.