**ASSOCIATED PRESS, Petitioner**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent**

Wire Service Guild, Local 222, The Newspaper Guild, AFL–CIO–CLC, Intervenor

.Noel M. YANCEY, Petitioner

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent**

The Associated Press, Intervenor

Nos. 73–1002, 73–1390

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 16, 1974.

Decided Feb. 20, 1974.

Stuart Rothman, Washington, D. C., for petitioner in No. 73–1002.

Robert L. Farmer, Raleigh, N. C., for petitioner in No. 73–1390.

Jonathan Axelrod, Atty., N. L. R. B., for respondent. John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Asst. Gen. Counsel, and Abigail Cooley Baskir, Atty., N. L. R. B., were on the brief for respondent. Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., also entered an appearance for respondent.

Sidney Reitman, Newark, N. J., was on the brief for intervenor Wire Service Local 222, Newspaper Guild, AFL–CIO.

Before BAZELON, Chief Judge, WRIGHT, Circuit Judge, and WYZANSKI,* Senior District Judge.

---

* Of the United States District Court for the District of Massachusetts, sitting by designation pursuant to 28 U.S.C. § 294(d) (1970).

J. SKELLY WRIGHT, Circuit Judge:

In these appeals[1] petitioners seek review of an order[2] of the National Labor Relations Board dismissing the portions of an unfair labor practice complaint finally resolved by an arbitrator's award and declining at this time to resolve the remaining contractual dispute pending further arbitration or amicable settlement.[3] Since we find that the Board properly acted within its discretion, we deny the petitions for review.

I

The Wire Service Guild represents a collective bargaining unit of Associated Press employees. In the first week of 1969 collective bargaining between the Guild and AP to produce a new contract for these employees broke down, and the company informed the Guild that the old contractual agreement, which by its terms had expired December 31, 1968, would not be in effect after January 7, 1969. On January 8, 1969 the Guild commenced a strike which ceased ten days later when a tentative agreement was reached. The final contract which was signed on April 25 was made retroactive only to January 15. During the period January 8 to January 15 when there was no collectively bargained contract in effect, approximately 102 members of the Guild crossed the strike picket line and worked for AP. Not only did many of these members resign from the Guild during this contractual hiatus period; they also attempted to revoke their authorization of AP to "checkoff" Guild dues from their wages. The AP complaint dismissed by the Board arose from the Guild's unwillingness to accept their attempted revocations as effective.

Both the old and the new contracts contained a "checkoff" article providing that upon an employee's written request AP would deduct Guild dues from his wages and remit those dues to the Guild. This article further provided that the employee's request would be made on a form which stated, *inter alia,*

> *that this assignment and authorization shall be continued automatically and shall be irrevocable for successive periods of one year* each from the date appearing below or for the period of each succeeding applicable collective agreement between the Employer and the Guild, whichever period shall be shorter, *unless written notice of its revocation is given by me to the Employer and to the Guild by registered mail not more than thirty (30) days and not less than fifteen (15) days prior to the expiration of each period of one year, or of each applicable collective agreement between the Employer and the Guild, whichever occurs sooner.*[4]

(Emphasis added.) Most of the employees who attempted to revoke their authorizations during the hiatus-strike period had made their wage assignments on forms including the above provision. The Guild therefore asserted to AP "that effective notice to revoke checkoff must be given between and including December 2 and December 16, 1968," and that it should be forwarded the dues for those members who attempted to revoke during the January strike.[5]

AP refused to remit the dues, relying on the fact that no collectively bargained contract was in effect during the period when the employees attempted to revoke

---

1. In No. 73–1390 the petitioner contends that since the Guild was hostile to his position and because he was not a party to the arbitration proceedings, the arbitrator's award is not binding on him. This contention is without merit since it is clear that AP fully and adequately defended his position at the hearing. *See* Ramsey v. NLRB, 7 Cir., 327 F.2d 784, 788, cert. denied, 377 U.S. 1003, 84 S. Ct. 1938, 12 L.Ed.2d 1052 (1964); *cf.* Haynes v. United States Pipe & Foundry Co., 5 Cir., 362 F.2d 414, 416–417 (1966). The other issues raised in No. 73–1390 are the same as those raised in No. 73–1002. Consequently, our disposition of those issues in that case makes separate consideration of them in No. 73–1390 unnecessary.

2. 199 NLRB No. 168, 81 LRRM 1535 (Oct. 27, 1972).

3. Our jurisdiction to review the order is provided by § 10(f) of the National Labor Relations Act, 29 U.S.C. § 160(f) (1970).

4. Joint Appendix at 127.

5. *Id.* at 129.

their dues. AP also resisted the Guild's request to submit the dispute to arbitration under a clause in the contracts providing that "[o]n the written demand of either party there shall be submitted to arbitration * * * all disputes arising out of the application of this Agreement." [6] On March 31, 1970, the United States District Court for the Southern District of New York granted the Guild's motion to compel arbitration.[7]

Prior to the arbitration hearing, AP filed unfair labor practice charges with the NLRB against the Guild based on its demands for dues checkoffs. Although the General Counsel of the NLRB issued a consolidated complaint based on these charges, the case was not submitted to the Board until after the arbitrator's decision.[8]

The arbitrator found that the checkoff authorization constituted a "simple contract" between AP and the employee which stood by itself and survived termination of any collective bargaining agreement.[9] He reasoned that whether or not a bargaining agreement between the union and the employer was in effect, an authorization could not be terminated by the employee at any time except during the period specified in the authorization for revocation. He thus found that when the new collective bargaining agreement became effective AP was again obligated to remit to the Guild the dues of those employees who did not revoke their authorizations during the time period specified.

The arbitrator concluded that this finding was not precluded by Section 302(c)(4) of the Labor Management Relations Act, 29 U.S.C. § 186(c)(4) (1970). This section permits employers to deduct money from the wages of employees in payment of union membership dues only if

the employer has received from each employee, on whose account such deductions are made, a written assignment which shall not be irrevocable for a period of more than one year, or beyond the termination date of the applicable collective agreement, whichever occurs sooner * * *.

The arbitrator rejected AP's argument that this language provides employees with a statutory right to revoke authorizations at the expiration of a collective bargaining agreement irrespective of the revocatory period provided in the authorizations. He found the statute to provide simply a limitation on checkoff irrevocability which was satisfied where the authorizations provided the employees with a reasonable revocation period that commenced before expiration of the agreement.

Although the arbitrator did find some of the revocations timely, he proceeded beyond the issue of timeliness to find them ineffective. At least one of the employees had notified AP, but not the Guild, of revocation during the contractual hiatus, which happened to be between 30 and 15 days prior to the anniversary of his original authorization. Other employees whose cases were before the arbitrator had signed authorization forms which provided for revocation by the employee at any time upon "30 days notice to both the AP and the Guild." The arbitrator held that these attempted revocations, though timely, were nevertheless ineffective because the employees had failed, as specified in their authorizations, to notify the Guild as well as AP of their revocations.[10]

---

6. *Id.* at 128.

7. Associated Press v. Wire Service Guild, Local 222, American Newspaper Guild, S.D. N.Y., 62 CCH Lab. Cas. 18,565 (1970).

8. The parties waived an evidentiary hearing before the trial examiner and issuance of a trial examiner's decision and recommended order. Joint Appendix at 5.

9. The arbitrator's decision is set forth in the Joint Appendix at 171–192.

10. Some of the employees whose attempted revocations were timely did notify the Guild that they were resigning from membership. But the arbitrator held that resignation did not constitute revocation. There has been no union security clause in any collective

As indicated, the Board's decision on review here was developed after the arbitrator's decision. The Board, applying a doctrine first enunciated in Spielberg Manufacturing Co., 112 NLRB 1080 (1955), found the arbitrator's award to dispose of the unfair labor practice charges before it insofar as the charges related to employees covered by the award. Under the *Spielberg* doctrine, the Board will dismiss unfair labor practice complaints where the issues raised therein have been resolved in arbitration awards which have resulted from "fair and regular" proceedings and which are "not clearly repugnant to the purposes and policies" of the National Labor Relations Act.[11] In the instant case, the Board exercised its discretion under this doctrine to defer to the arbitrator's decision that the disputed checkoffs of dues from AP employees' wages were pursuant to lawful authorizations. Since the merits of the unfair labor practice charges before it turned on this contractual issue, the Board dismissed the complaint. However, inasmuch as the arbitrator did not rule on the effectiveness of the attempted revocation of one group of the employees, the Board did retain jurisdiction over the dispute

for the purpose of entertaining an appropriate and timely motion for further consideration upon a proper showing that either (a) the dispute has not, with reasonable promptness after the issuance of the Decision herein, either been resolved by amicable settlement in the grievance procedure or submitted promptly to arbitration, or (b) the grievance or arbitration procedures have not been fair

and regular or have reached a result which is repugnant to the Act.[12]

This limited retention of jurisdiction constituted an application of the Board's decision in Collyer Insulated Wire, 192 NLRB 837 (1971). In *Collyer* the Board concluded that when it was presented with a dispute over the terms and meaning of a collective bargaining agreement and that agreement provided for processes such as arbitration for resolution of such disputes, the Board had discretion to recommend that the dispute be submitted to the privately agreed upon processes subject to review by the Board.[13]

## II

We find application of the *Spielberg* and *Collyer* doctrines in this case to be an appropriate exercise of the Board's discretion in implementing the National Labor Relations Act. As recently as its present term, the Supreme Court has stressed the "strong federal policy favoring arbitration of labor disputes" [14] and noted that this policy "is firmly grounded in congressional command. Section 203(d) of the Labor-Management Relations Act, 29 U.S. C. § 173(d), states in part:

'Final adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement.' " [15]

In the famous *Steelworkers Trilogy*[16] the Court relied on this federal policy in holding that courts should order arbitration unless they can be assured that "the

bargaining agreement between the Guild and AP so employee membership in the Guild is voluntary.

11. Spielberg Manufacturing Co., 112 NLRB 1080, 1082 (1955).

12. Joint Appendix at 19–20.

13. Collyer Insulated Wire, 192 NLRB 837, 839, 843 (1971).

14. Gateway Coal Co. v. United Mine Workers of America, 414 U.S. 368, 382, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974).

15. *Id.*, 414 U.S. at 377, 94 S.Ct. at 636.

16. United Steelworkers of America v. American Manufacturing Co., 363 U.S. 564, 80 S. Ct. 1343, 4 L.Ed.2d 1403 (1960) ; United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960) ; United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

arbitration clause is not susceptible of an interpretation that covers the asserted dispute." [17]   The Court has further encouraged arbitration and other "administrative techniques for the peaceful resolution of industrial disputes" [18] by holding that arbitration clauses in collective bargaining agreements create an obligation not to strike over disputes covered by the clause.[19]

■■   Indeed, in holding that a dispute which may be cognizable under the National Labor Relations Act may still be submitted to arbitration, the Supreme Court noted the Board's *Spielberg* doctrine and quoted approvingly from one of the Board's earlier applications of it.[20]   Following the Court's apparent approval of *Spielberg*, at least two circuits have directly upheld Board deferrals to arbitration awards [21]; and though this court has not yet done so,[22] we do not hesitate to join these circuits today. We think it clear that submission to grievance and arbitration proceedings of disputes which might involve unfair labor practices would be substantially discouraged if the disputants thought the Board would give *de novo* consideration to the issue which the arbitrator might resolve.   Such discouragement would be

contrary to the Supreme Court's efforts to effectuate the congressional desire to support "administrative techniques for the peaceful resolution of industrial disputes." [23]   The Board does not abdicate its responsibilities to implement the National Labor Relations Act by respecting peaceful resolution of disputes through voluntarily agreed upon administrative techniques as long as it is assured that those techniques are procedurally fair and that the resolution is not clearly inconsistent with or repugnant to the statute.

■   Petitioners here contend that the arbitrator's award was repugnant to the statute because of his interpretation of Section 302(c)(4)'s limitation on irrevocability of dues checkoff authorizations.   We do not intend, any more than did the Board, to pronounce an interpretation of Section 302(c)(4).   It suffices to conclude that the arbitrator's reasonable interpretation was not inconsistent with either the fundamental purposes or the specific provisions of the sections of the National Labor Relations Act which it is the duty of the Board to implement.

■   We also have no difficulty in affirming the Board's refraining from ruling on that aspect of the dispute yet to

---

17. Warrior & Gulf Navigation Co., *supra* note 16, 363 U.S. at 582–583, 80 S.Ct. at 1353.

18. Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235, 251, 90 S.Ct. 1583, 1593, 26 L.Ed.2d 199 (1970).

19. Teamsters Local 174 v. Lucas Flour Co., 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962).   This obligation is cognizable in suits brought in federal district courts pursuant to § 301(a) of the Labor-Management Relations Act, 29 U.S.C. § 185(a) (1970), not only for damages, *id.*, but also for injunctive relief, *Gateway Coal Co.*, *supra* note 14; *Boys Markets, Inc.*, *supra* note 18.

20. Carey v. Westinghouse Corp., 375 U.S. 261, 271, 84 S.Ct. 401, 408, 11 L.Ed.2d 320 (1964).   The Court adopted the words of International Harvester Co., 138 NLRB 923, 925–926 (1962) :

There is no question that the Board is not precluded from adjudicating unfair labor practice charges even though they might have been the subject of an arbitration proceeding and award. * * * However, it is equally well established that the Board has considerable discretion to respect an arbitration award and decline to exercise its authority over alleged unfair labor practices if to do so will serve the fundamental aims of the Act.

21. NLRB v. Auburn Rubber Co., 10 Cir., 384 F.2d 1 (1967) ; Ramsey v. NLRB, *supra* note 1, 327 F.2d 784.   *See also* language favorable to the *Spielberg* policy in NLRB v. Horn & Hardart Co., 2 Cir., 439 F.2d 674 (1971) ; John Klann Moving & Trucking Co. v. NLRB, 6 Cir., 411 F.2d 261, 263 (1969) ; Office & Professional Employees Int. Union, Local 425 v. NLRB, 136 U.S.App.D.C. 12, 16, 419 F.2d 314, 318 (1969).

22. *But see* favorable dicta in *Office & Professional Employees Int. Union, Local 425, supra* note 21, 136 U.S.App.D.C. at 16, 419 F.2d at 318.

23. *Boys Markets, Inc., supra* note 18, 398 U.S. at 251, 90 S.Ct. at 1593.

be resolved. The Board's deferral of consideration of the unresolved matters until the parties have had further opportunity to settle them amicably through the arbitration machinery was, as stated above, an application of a policy first enunciated in Collyer Insulated Wire, supra.[24] The Collyer doctrine and its application in this case are supported by the same federal labor policy favoring settlement of disputes through procedures provided by collective bargaining agreements. Absent the doctrine, parties would be encouraged to circumvent grievance and arbitration procedures for which they had contracted whenever they felt they had a better chance for a favorable resolution by quickly filing an unfair practice charge before the Board. Even where, as here, neither party has attempted to invoke an arbitration clause over certain contractual disputes, the Board does not abuse its discretion by suggesting that they do so in order to resolve the disputes without governmental intervention and expenditure of Board and judicial resources.[25] This is especially true where the disputed matters are as closely related as are the unresolved revocations here to claims already settled by arbitration.

The Board did not suggest that it would refuse to consider the unresolved revocations if the Guild and AP both steadfastly refused to submit them to arbitration. As in all Collyer-based orders, the Board stated it would entertain a motion for further consideration if the dispute was not resolved with reasonable promptness by arbitration or other peaceful means. We intimate no view as to whether the Board has discretion to refuse to consider an unfair labor practice complaint when both disputants reject employment of an arbitration clause after a Collyer order. We only note that this issue is not presented in the case before us.

Petitions for review denied.

24. We join the Second Circuit in affirming the Collyer doctrine. See Nabisco, Inc. v. NLRB, 479 F.2d 770 (1973), enforcing 198 NLRB No. 4 (1972). Though other courts have acknowledged the doctrine with apparent approval, see, e. g., NLRB v. Int. Assn of Bridge, Struc., Ornamental & Reinforced Iron Wkrs Union, Local 378, 9 Cir., 473 F. 2d 816 (1973); Lodge 1327, Int. Assn of Machinists & Aerospace Wkrs v. Fraser & Johnston Co., 9 Cir., 454 F.2d 88, 91 (1971), cert. denied, 406 U.S. 920, 92 S.Ct. 1775, 32 L.Ed.2d 119 (1972); NLRB v. Thor Power Tool Co., 7 Cir., 351 F.2d 584, 587 (1965), no other circuit seems to have directly passed on Collyer.

25. Of course, administrative or judicial burdens would never provide excuse for the Board's abdication of its responsibilities to implement the National Labor Relations Act. However, as long as the Board does not defer to arbitration awards which are either unfairly developed or inconsistent with the Act, a discretionary use of its conflict-resolving resources is well within the design of Congress. As stated in the Senate report on the 1947 amendments to the Act, the Board is to

develop * * * a policy of entertaining under these provisions only such cases alleging violation of contract as cannot be settled by resort to the machinery established by the contract itself, voluntary arbitration, or if necessary by litigation in court. Any other course would engulf the Board with a vast number of petty cases that could best be settled by other means. In short, the intention of the committee in this regard is that cases of contract violation be entertained on a highly selective basis, when it is demonstrated to the Board that alternative methods of settling the dispute have been exhausted or are not available.

S.Rep.No.105, 80th Cong., 1st Sess., 23, in 1 Legislative History of the Labor Management Relations Act, 1947, 429 (1948).