664 F.2d 318
 107 L.R.R.M. (BNA) 3137, 92 Lab.Cas. P 12,939
 LIQUOR SALESMEN'S UNION LOCAL 2 OF the STATE OF NEW YORK,
DISTILLERY, RECTIFYING, WINE & ALLIED WORKERS'
INTERNATIONAL UNION, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
CHARMER INDUSTRIES, INC., Star Industries, Inc., Standard
Wine & Liquor Co., Inc., Peerless Importers, Inc.,
and National Distillers Distributing
Co., Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
PARK & TILFORD & MOTEL & CLUB, DIVISIONS OF KNICKERBOCKER
LIQUORS CORP., Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
and
Liquor Salesmen's Union Local 2, Intervenor.
 No. 961, Docket 80-4264.
 United States Court of Appeals,
Second Circuit.
 Argued April 10, 1981.
Decided July 29, 1981.
 
 Allen B. Roberts, New York City (Sloan, Roberts & Finger, New York City, of counsel), and Morton Schimmel, New York City, for petitioners Charmer Industries, Inc., et al.
 Charles O. Strahley, New York City (Putney, Twombly, Hall & Hirson, New York City, of counsel), for petitioner Knickerbocker Liquors Corp.
 Victor Feingold, New York City, for petitioner-intervenor Liquor Salesmen's Union Local 2.
 Miriam Szapiro, Atty., N. L. R. B., Washington, D. C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Andrew F. Tranovich, Atty., N. L. R. B., Washington, D. C., of counsel), for respondent National Labor Relations Board.
 Before FEINBERG, Chief Judge, and WATERMAN and VAN GRAAFEILAND, Circuit Judges.
 FEINBERG, Chief Judge:
 
 
 1
 This case, incredibly, arises out of an alleged unilateral change of work rules in 1975 by six liquor wholesalers ("the companies") in breach of their respective collective bargaining agreements with the union representing their salesmen-employees. The dispute was submitted to an arbitrator, who found that the agreements had not been violated. Dissatisfied with this conclusion, the union succeeded in bringing the case before the National Labor Relations Board, which declined to defer to the arbitrator's award under the policy of deference first announced in Spielberg Manufacturing Co., 112 N.L.R.B. 1080 (1955). Instead, the Board found that the companies had committed an unfair labor practice and issued a remedial order. Under the circumstances presented here, we conclude that the Board abused its discretion in not deferring to the arbitrator's award, and we deny enforcement of the Board's order.
 
 I. Prior Proceedings
 
 2
 The companies are engaged in the wholesale distribution of alcoholic beverages to restaurants, bars, liquor stores, and the like in the New York City metropolitan area. Their salesmen, who work on a commission basis, are represented by petitioner-intervenor Liquor Salesmen's Union Local 2 of the State of New York, Distillery, Rectifying, Wine & Allied Workers' International Union, AFL-CIO.[1] The companies' drivers are represented by Local 816 of the International Brotherhood of Teamsters, which is not a party to this litigation.
 
 
 3
 Collective bargaining agreements between the companies and the two unions were due to expire on October 31, 1975; as that date approached, negotiations of new agreements occurred simultaneously, but independently of each other. Under the expiring agreement between the companies and the drivers' union, the drivers bore responsibility for the collection of payment from all C.O.D. customers at the time of delivery. In the closing hours of negotiations over the new agreement, the companies agreed to free the drivers of this task. They did not inform Local 2 of this change, however, and negotiations between the companies and that union did not address the subject of collections before tentative accord on a three-year contract was reached on November 2, subject to ratification by the Local's members.
 
 
 4
 On November 3, officials of one of the companies, Peerless Importers, Inc., distributed to its salesmen a handwritten directive on the handling of C.O.D. accounts, stating that customers could mail checks or that salesmen could pick the checks up from the customers and bring them to the office, after which the order would be shipped. Caught short by these new procedures, several C.O.D. customers complained to the salesmen when they did not receive their deliveries. The salesmen, in turn, complained to their union about the added burden being placed on them.
 
 
 5
 By the time of the Local 2 ratification meeting on November 7, the union was aware of the change in collection procedures. At the meeting, the president of Local 2 spoke to the salesmen about the change:
 
 
 6
 Without prior discussion with the union, some employees circulated photocopies of a handwritten instruction that salesmen are to pick up C.O.D. payments in the form of checks or otherwise in order to have the orders filled. This is a violation of our contract, and I direct you that this change in our work rules shall not be honored by you until further notice. I instruct you to disregard it, and I will so advise your employer.
 
 
 7
 With this instruction given, the salesmen proceeded to ratify the new agreement without further consideration of the collection issue.
 
 
 8
 Shortly thereafter, each of the companies circulated announcements to its salesmen outlining and clarifying the new procedures. With variations from company to company, the new procedures generally encompassed three options. First, customers could mail in checks, with delivery taking place upon receipt; this procedure involved a delay of three days or so. Second, customers could leave signed blank checks with the companies, lessening the delay in delivery though obviously creating other problems of security. Third, customers could give checks directly to the salesmen, who could either bring the checks in immediately or call in the check number and amount, turning in the actual check the next day.
 
 
 9
 The companies generally took pains to stress the freedom of the salesmen to choose any procedure they wished, asserting that it was the individual salesman's "prerogative" to pick up payment rather than adopt an alternative that involved less of a burden. There was, on the other hand, some evidence of pressure on the salesmen to collect the checks themselves. The salesmen, moreover, argue that economic realities made it essential that they handle the collections personally. Since the business is highly competitive, they point out, an unwillingness by one salesman to pick up payment and thus to permit same-day delivery will simply lead his customer to turn elsewhere. As the arbitrator observed, "(t)he sad fact from the salesman's point of view is that, except for a small number with exclusive rights to a few brands, each salesman generally competes with the salesmen representing other wholesalers, all selling the same brands at the same prices."
 
 
 10
 On November 12, 1975, Local 2 president Joseph Matranga sent a letter to the companies asserting that the companies had "unilaterally and without notice changed a very serious working condition that has existed for many years in the industry and which is raising havoc with the rights of our members in the pursuit of their occupation." The letter claimed that "some or all of the employers have instructed the employees to pick up payment in advance from all customers who are on a Cash or COD basis." Citing the dangers and burden thus imposed, and charging that the employers were violating both the National Labor Relations Act and their contracts, Matranga said he would "be available immediately at my office for an open and frank discussion of this matter in order to avoid a confrontation on this issue." On the same day, however, Matranga wrote the companies' counsel, enclosing a final draft of the new contract and asking him for his approval of the draft so that copies could be prepared for formal signature.
 
 
 11
 Replying to the former letter the next day, counsel for the companies suggested that Matranga was "attempting to renegotiate the Teamsters', Local 816 contract," and denied that the employers had changed a working condition unilaterally and without notice. The union's response was prompt: the following day, Matranga filed unfair labor practice charges against one of the companies with the NLRB, alleging that the change in "work rules" constituted an unfair labor practice under sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (a)(5). Soon thereafter, however, the union withdrew the charges and in February 1976 served on the companies a notice of intention to arbitrate, in accordance with the arbitration provision of the collective bargaining agreements. When the companies resisted arbitration, the union reinstated charges against all of them in March 1976, adding a charge of refusal to submit to arbitration. The Board's Regional Director, however, deferred action on the charges pending resolution of the requested arbitration proceedings. The companies' effort to avoid arbitration finally failed on June 1976, when Judge Charles S. Haight, Jr., of the United States District Court for the Southern District of New York denied their motion for a stay of arbitration and granted the union's cross-motion to compel the arbitration. Charmers Industries, Inc. v. Liquor Salesmen's Union Local No. 2, 415 F.Supp. 781, 787 (S.D.N.Y.1976).
 
 
 12
 The arbitration then took place under the auspices of the New York State Mediation Board, culminating in an award by arbitrator Arthur T. Jacobs dated April 7, 1977. In a careful opinion, the arbitrator concluded that "(t)he Employers did not violate their contract with Local 2 when they adopted their present C.O.D. procedures." He noted, first, that the bargaining agreements contained no provisions governing C.O.D. procedures, so that there had been no violation of the agreements' "direct wording." He also found no violation of "any meaningful concept of past practice," observing:
 
 
 13
 In the absence of a past practice clause, arbitrators including this one, and the courts have nevertheless frequently found that past practice was significantly implied in the contractual relations involved and could be used to justify a decision and an award.
 
 
 14
 I cannot so find here for several reasons which stem from the limitations of the contract. First, the salesmen although called employees are basically independent entrepreneurs (like manufacturer representatives) ....
 
 
 15
 Past practice in the industry did not require the salesmen to collect on their C.O.D. accounts. Present practice is the same. It is the individual salesman who decides for himself whether to do so or not. If he decides to collect, then it is he who is going contrary to past practice and deliberately so. The companies are being consistent. They did not require salesmen to pick up C.O.Ds. prior to November 1, 1975 and they have told the salesmen consistently since that they are not obligated to do so.
 
 
 16
 In the light of this very special employee status and of the companies' care to emphasize to the salesmen from November 2, 1975 on that whether or not they serviced C.O.D. accounts was entirely their prerogative, it is impossible to find that the companies have been directing or ordering or mandating that the salesmen must service C.O.Ds.
 
 
 17
 Addressing the union's contention that the salesmen's "prerogative" to collect or not to collect was illusory, since economic reality made collections necessary, the arbitrator stated:
 
 
 18
 The Union's argument that the wholesalers are engaging in a "sham," while conceivably true, was not proved by the testimony. The many salesmen who testified only proved what I just described: an industry where although they are represented by the same Union, each company's salesmen compete against the salesmen of the other wholesalers and as a group they have been unwilling or unable to require all of the Union's members to forego collections on C.O.D. accounts and to force such accounts to pay for their goods by themselves delivering or mailing cash, a money order, or a certified check to the companies.
 
 
 19
 The union promptly applied to the Board's Regional Director to re-initiate proceedings to consider the charges filed in March 1976. The Regional Director, however, refused to issue a complaint against the companies. Citing the Board's practice under Spielberg of deferring to arbitration awards that meet certain conditions, the Director noted:
 
 
 20
 In the instant case, there is no evidence that the arbitration proceedings were not fair or regular. Moreover, the evidence indicates that all parties and their counsel participated in the proceedings and the arbitrator was aware of the unfair labor practice issue. While the arbitrator's award may not be the one the Board would issue, where the Spielberg standards discussed above are met and the result is not clearly repugnant to the Act, the Board defers to the decision of the arbitrator (citation omitted).
 
 
 21
 The Director distinguished the decisions cited by the union to justify setting aside the award on the ground that they had not been cases in which an arbitrator's award "deal(t) squarely with the substance of the asserted violations of Section 8(a)(5)." Finally, in declining to issue a complaint, he specifically found that the award was "not clearly repugnant to the policies or purposes of" the NLRA.
 
 
 22
 Aggrieved once again, the union appealed to the Board's General Counsel, who reversed the Regional Director's decision and instructed him to issue a complaint. The Director did so, and shortly thereafter, the companies moved for summary judgment on the basis of the arbitration award, citing the Board's policy of deference to such awards under Spielberg. In an order dated November 14, 1977, the Board denied the motion, giving only the following explanation of its decision not to defer to the award:
 
 
 23
 The Board, having duly considered the matter, is of the opinion that Respondents (i. e., the companies) are not entitled to summary judgment ... for the reason that the Arbitrator's Award which is alleged to be dispositive of the matter demonstrates on its face that the Arbitrator ruled in favor of respondents herein because the contract between the parties contained no provisions pertaining to the matters at issue herein, and that it precluded consideration of past practices relating to the matter. Hence, his award that the "Employers did not violate their contract with Local 2 when they adopted their present C.O.D. procedures," does not dispose of the unfair labor practice allegations of the complaint.
 
 
 24
 The Board ordered a hearing before an administrative law judge (ALJ), which took place in March 1978.
 
 
 25
 While the case was pending before the ALJ, the expiration date of the 1975 contracts approached. We were informed at oral argument that the parties returned to the bargaining table to negotiate new agreements and that the C.O.D. collection procedures were a subject of the bargaining; apparently, the union was unable to persuade the companies to change the practice developed under the 1975 contracts, which has therefore remained essentially unchanged.
 
 
 26
 In September 1979, the ALJ issued a 19-page decision in favor of the union-more than a year and a half after the hearing. The ALJ found that the companies had "made unilateral changes with respect to the terms and conditions of employment of (the) employees, and thereby refused to bargain and continue to refuse to bargain in violation of Section 8(a)(5) and (1) of the Act." The ALJ did not directly address the reasoning or conclusion of the arbitrator, asserting only that the Board's refusal to defer to the award was binding on her as the law of the case.
 
 
 27
 By a decision and order dated June 30, 1980-nine months after the ALJ's decision and more than four and a half years after the events giving rise to the complaint-the Board affirmed the rulings, findings, and conclusions of the ALJ and adopted her recommended order, with certain modifications. The Board's remedy included a general order that the companies cease and desist from refusing to bargain with the union by making unilateral changes in working conditions. At a more concrete level, the Board also ordered the companies to "restor(e) the status quo ante to those conditions which obtained prior to November 1, 1975 with respect to delivery schedules and collections of prepayments for C.O.D. orders as they related to the working conditions of Salesmen"; to make the salesmen whole for any lost time or added expense resulting from the change in working conditions; and to rescind any disciplinary action taken against salesmen because of lost commissions or accounts. See Charmer Industries, Inc., 250 N.L.R.B. No. 31 (June 30, 1980).
 
 
 28
 One month later, the companies petitioned this court for review of the Board's order; the Board cross-applied for enforcement of the order. Local 2, however, had not been idle, filing its own petition for review of the order on July 3, 1980, in the United States Court of Appeals for the District of Columbia Circuit. The union's petition sought review of the Board's failure to address-and thus its implicit denial of-the union's request for attorneys' fees as part of the remedial order. On March 31, 1981, a panel of the District of Columbia Circuit Court exercised its discretion under 28 U.S.C. § 2112(a) to transfer the union's petition to this court for disposition in conjunction with the companies' petitions. Liquor Salesmen's Union Local 2 v. NLRB, --- F.2d ---- at ---- - ----, No. 80-1746 (D.C.Cir. Mar. 31, 1981).
 
 
 29
 Thus, after five years and five months, this dispute over an alleged failure to bargain in 1975 came before this court.
 
 II. The Board's Deference Criteria
 
 30
 As will be seen below, the only substantive issue we find it necessary to reach in this case is whether the Board abused its discretion in declining to defer to the arbitrator's award.
 
 
 31
 In furtherance of the national labor policy goal of encouraging the voluntary settlement of industrial disputes through arbitration, the National Labor Relations Board announced in 1955 that it would defer, as a matter of discretion, to an arbitrator's award pursuant to the provisions of a collective bargaining agreement in cases in which "the proceedings appear to have been fair and regular, all parties had agreed to be bound, and the decision of the arbitration panel is not clearly repugnant to the purposes and policies of the (National Labor Relations) Act." Spielberg Manufacturing Co., supra, 112 N.L.R.B. at 1082. This policy of deference-the Spielberg doctrine-obtained Supreme Court sanction in Carey v. Westinghouse Corp., 375 U.S. 261, 270-72, 84 S.Ct. 401, 408-09, 11 L.Ed.2d 320 (1964).
 
 
 32
 Over the years, the number and nature of the criteria applied to deference decisions have changed. The concept of "clearly repugnant," for example, has proved elusive, with the Board and courts viewing it sometimes as a test of whether the arbitrator's award was "palpably wrong," see, e. g., International Harvester Co., 138 N.L.R.B. 923, 929 (1962), enf'd sub nom. Ramsey v. NLRB, 327 F.2d 784 (7th Cir.), cert. denied, 377 U.S. 1003, 84 S.Ct. 1938, 12 L.Ed.2d 1052 (1964); or not "consistent with Board law," see, e. g., Kansas City Star, Inc., 236 N.L.R.B. 866, 869 (1978) (Member Truesdale, concurring); or "arguably ... not inconsistent with Board policy," see NLRB v. Pincus Brothers, Inc.-Maxwell, 620 F.2d 367 (3d Cir. 1980).[2]
 
 
 33
 In addition, the Board has followed an on-again, off-again requirement that the arbitrator have "clearly decided" the statutory issues involved in the unfair labor practice charge as well as the purely contractual issues presented under the terms of the collective bargaining agreement. One of the union's principal arguments is that this case "presents a classic example of an Arbitrator's refusal to address himself to the issues raised by the unfair labor practice case." The arbitrator, the union asserts, "completely failed to pass on the statutory issue, to wit, that the salesmen can no longer enjoy the same prompt delivery for C.O.D. sales and credit sales without assuming the added burdens of a collection agent; and whether the employers by unilateral action, improperly placed such added burdens on the salesmen in violation of the statute."
 
 
 34
 The idea that an arbitration award meriting deference must have considered and resolved statutory as well as contractual issues was elaborated in the Board's decision in Raytheon Co., 140 N.L.R.B. 883 (1963), enforcement denied on other grounds, 326 F.2d 471 (1st Cir. 1964). In Raytheon, a case involving alleged discrimination in violation of sections 8(a)(1) and 8(a)(3) of the NLRA, the Board implicitly added a fourth criterion to the three set forth in Spielberg: it refused to defer to an arbitration award where "the arbitrator did not, and was advised that he could not, even consider evidence that protected concerted and union activities were possible causes for the discharges" that had been the subject of the arbitration. Id. at 886. The Raytheon rule was extended in Airco Industrial Gases, 195 N.L.R.B. 676 (1972), to cases in which the arbitration award simply "gives no indication that the arbitrator ruled on the unfair labor practice issue," id. at 677, even if the award contained no express indication that the arbitrator had not considered the statutory issue. The Board went a step further in Yourga Trucking, Inc., 197 N.L.R.B. 928 (1972), holding that the party seeking deference to an arbitrator's award bore the burden of "adduc(ing) proof regarding the scope of matters presented in the arbitration proceeding." Id.
 
 
 35
 Two years later, the Board reversed itself in Electronic Reproduction Service Corp., 213 N.L.R.B. 758 (1974). Expressly overruling Airco and Yourga, the Board asserted that henceforth it would assume that an award resolved statutory as well as contractual issues "except where unusual circumstances are shown which demonstrate that there were bona fide reasons, other than a mere desire on the part of one party to try the same set of facts before two forums, which caused the failure to introduce such evidence at the arbitration proceeding." Id. at 762 (footnote omitted). In Stephenson v. NLRB, 550 F.2d 535, 539 (9th Cir. 1977), a panel of the Ninth Circuit, while acknowledging the Board's "laudable" goal, characterized Electronic Reproduction Service as "an unjustifiable extension of its deferral policy." Stephenson adopted instead the position taken by the District of Columbia Circuit Court in Banyard v. NLRB, 505 F.2d 342, 348 (D.C.Cir.1974), adhering to the requirement that the arbitrator have "clearly decided the issue on which it is later urged that the Board should give deference."
 
 
 36
 Acknowledging the criticism in Stephenson and similar decisions, the Board reversed itself once again in Suburban Motor Freight, Inc., 247 N.L.R.B. No. 2, 103 L.R.R.M. 1113 (Jan. 8, 1980), overruling Electronic Reproduction Service and returning to the standards set forth in Airco and Yourga. The Board announced that "we will no longer honor the results of an arbitration proceeding under Spielberg unless the unfair labor practice issue before the Board was both presented to and considered by the arbitrator." 103 L.R.R.M. at 1114. We assume that Suburban Motor Freight validly and accurately describes the Board's current view on this question and is applicable here.
 
 III. Application of Deference Criteria
 
 37
 Against this background we turn now to the manner in which the Board applied its deference criteria. As already indicated, the union argues that the arbitrator did not "address" the unfair labor practice issues and therefore the Board properly refused to defer to the arbitration award. It is true that the arbitrator did not, in so many words, find that the companies had refused to bargain over a unilateral change in working conditions, in violation of sections 8(a)(1) and 8(a)(5). Instead he found, as a matter of contract interpretation and in the light of an examination of past practice, that the companies' institution of new procedures after November 1, 1975, did not impose a change in rules. This determination, however, was necessarily dispositive of the statutory issue: if no change in working conditions was imposed, no duty to bargain arose, and no unfair labor practice could have been committed. Because both the contractual and statutory issues rest on the same factual determinations, the arbitrator's better position and expertise as a fact-finder strengthen the case for deference to his findings. Cf. Stephenson v. NLRB, 550 F.2d 535, 538 n.4 (9th Cir. 1977). Under these circumstances, to insist here that the arbitrator announce that his resolution of the contractual dispute is intended as a resolution of the statutory issue as well is to impose a purely formalistic requirement. Thus, we conclude that the Board's "clearly decided" criterion was met in substance in this case.
 
 
 38
 In addition, this case presents what might be regarded as a congruence of interests, in that the union's claim primarily involves an asserted right affecting the union as a whole-a "group right" to certain working conditions. It is thus not a case in which an arbitrator's award affects rights of individuals or groups not directly party to the arbitration-as, for example, when a dispute arising out of an allegedly discriminatory discharge of an individual employee is brought to arbitration. See, e. g., Banyard v. NLRB, supra; cf. Alexander v. Gardner-Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) (rejecting a policy of deference to arbitration awards implicating individual statutory rights under Title VII of the Civil Rights Act).
 
 
 39
 The Spielberg criteria for deference would still not be satisfied if the result reached by the arbitrator were found to be "clearly repugnant" to the Act. In this case, however, the Board made no such determination. Indeed, as indicated earlier, see page 322 supra, the Board's Regional Director specifically found that the award was not clearly repugnant to the Act's policies or purposes, and the Board offered no persuasive justification for setting this finding aside. The Board's only rationale for declining to defer was the assertion that the arbitrator had ruled in favor of the companies "because the contract between the parties contained no provisions pertaining to the matters at issue herein, and that it precluded consideration of past practices relating to the matter." It is on this basis, therefore, that the Board's decision must be reviewed. And on this basis, we believe the decision constitutes an abuse of discretion. The Board's rationale is simply incorrect; as the excerpts from the arbitrator's decision set out above indicate, the arbitrator plainly did consider past practice relating to C.O.D. collections, concluding that the companies had not departed from past practice. The arbitrator carefully presented the evidence on which he relied in reaching this conclusion, and while there was undoubtedly evidence to the contrary as well, the underlying questions were primarily factual issues that the arbitrator was best situated to resolve. His decision, moreover, was not "clearly repugnant" to the Act, as the Board's Regional Director found in his initial decision to defer. In short, the Board in this case declined to defer to an arbitrator's award that satisfied all of the criteria the Board has set, on grounds that do not withstand even casual scrutiny.
 
 
 40
 We do not doubt that the Board has wide discretion in defining the circumstances under which it will defer to an arbitration award, or indeed in determining whether it will defer under circumstances. The Board is not required by statute to defer; as we have had occasion to note before, "the Board's rules on deference, after all, are self-imposed although it has followed healthy hints from the Supreme Court." NLRB v. Horn & Hardart Co., (2d Cir. 1971) 439 F.2d 674, 679. Once the Board has announced a particular set of rules, however, some constraints necessarily arise to limit its discretion in individual cases.[3] The Board cannot lightly change the rules on a case by case basis. As we said in Horn & Hardart,
 
 
 41
 We do not suggest that the Board can announce a policy regarding deference to arbitration and then blithely ignore it, thereby leading astray litigants who depended upon it. But it can change its mind or alter its standards for deference in some respects without necessarily engaging in conduct so blameworthy as to justify our calling it abuse of discretion.
 
 
 42
 Id. See also Roadway Express, Inc. v. NLRB, 647 F.2d 415, 418-419 (text accompanying notes 4-7) (4th Cir. 1981); Hawaiian Hauling Service, Ltd. v. NLRB, 545 F.2d 674, 676 (9th Cir. 1976), cert. denied, 431 U.S. 965, 97 S.Ct. 2921, 53 L.Ed.2d 1061 (1977).
 
 
 43
 We want it to be clear that we hold no special brief for the conduct of the companies in this case, and we express no approval of their failure promptly to inform the salesmen's union of the changes being made in the 1975 drivers' contract or the companies' dilatory resistance to the union's initial request for arbitration. We are similarly unimpressed with the union's actions, since there is little room for doubt that before it finally accepted the 1975 contract, the union was aware of what had occurred in the companies' bargaining with the drivers; moreover, the union itself sought arbitration and then refused to abide by the result. In addition, it may be that reasonable persons will differ on whether the arbitrator reached the correct result. But all these concerns are secondary: the issue before us is whether we should enforce the Board's order.
 
 
 44
 In this case, the Board did not purport to clarify or revise its announced standards for deference. Strictly speaking, it did not even decide whether the circumstances presented here warranted an exercise of its discretion in deferring to the arbitrator's award. Instead, acting on a motion for summary judgment, it misconstrued the arbitrator's award and, relying exclusively on its misconstruction, "blithely ignored" its own standards.[4] To accept its action in this case would render the Board's-and the courts'-laboriously developed standards of deference virtually meaningless, depriving parties to collective bargaining agreements of a reasonable expectation of finality in properly conducted arbitrations and significantly undermining the value and efficacy of arbitration as an alternative to the judicial or administrative resolution of labor disputes.
 
 
 45
 Although these considerations alone provide ample support for our decision not to enforce the Board's order in this case, we must note in addition the difficulties posed by the nature of the order itself. As indicated earlier, the essential thrust of the order is that the companies bargain with Local 2 over the issue of C.O.D. collections. But as we also indicated earlier, the union and the companies did have an opportunity to bargain over the issue in the course of negotiating the agreements to replace the 1975 contracts when they expired in 1978. The parties were not able in those negotiations to devise rules on collections acceptable to both sides, so that, as we were informed at oral argument, the practice under the 1978 contracts has remained essentially the same as under the 1975 contracts. Thus, the Board would now, in effect, give to the union the most it could possibly have hoped to obtain in bargaining-a return to the old system of collection or its compensatory equivalent-as an interim measure, while ordering bargaining that has in fact already occurred, although not with results desired by the union. We think that such an order, in so stale a dispute originally caused by the exigencies of simultaneous bargaining with two unions almost six years ago, has a distinct air of unreality about it, and we are left with the conviction that its enforcement would not serve the ends of justice or the purposes of national labor law.
 
 
 46
 Accordingly, we grant the petitions for review filed by the companies and deny the Board's cross-application for enforcement of its order.
 
 IV. The Union's Petition
 
 47
 We turn finally to the union's petition for review of the Board's order insofar as the Board did not act on its request for attorneys' fees as part of the remedy sought. We see no merit in the union's argument that the companies have engaged in frivolous litigation, and we similarly see no basis for concluding that the Board abused its discretion in this connection. The petition is accordingly denied.
 
 
 
 [1]
 For convenience, we will sometimes refer to petitioner-intervenor as Local 2 or the union
 
 
 [2]
 The Board's shifting application of the "clearly repugnant" standard has particularly vexed Member Penello. See, e. g., Atlantic Steel Co., 245 N.L.R.B. No. 107, slip op. at 13 (Member Penello, concurring) (Sept. 28, 1979); Sea-Land Service, Inc., 240 N.L.R.B. 1146, 1151 (1979) (Member Penello, dissenting)
 On the "clearly repugnant" controversy, see generally Note, Limiting Deferral Under the Spielberg Doctrine, 67 U.Va.L.Rev. 615, 621 (1981) ("The 'clearly repugnant' standard appears to be more literal than actual, ... for the Board rarely defers unless the award comports with the Board's opinion as to the proper result (footnote omitted).").
 
 
 [3]
 We are aware of the sharp differences of view expressed on this point in the opinions of Judges Rosenn and Garth in NLRB v. Pincus Brothers, Inc.-Maxwell, supra, with Judge Garth arguing that the Board is bound by Spielberg as a matter of law, and its decisions in individual cases thus reviewable under a standard of legal error. See 620 F.2d at 378-81. Judge Rosenn's view that individual determinations also remain subject to an abuse-of-discretion standard of review appears to have prevailed, however, in the Third Circuit. See NLRB v. General Warehouse Corp., 643 F.2d 965, 970 (3d Cir. 1981)
 In this circuit, we have consistently reviewed individual deference decisions for abuse of discretion rather than legal error. See, e. g., NLRB v. Horn & Hardart Co., supra, 439 F.2d at 679. Cf. Lodges 700, 743, 1746, International Association of Machinists v. NLRB, 525 F.2d 237, 246 (2d Cir. 1975), and Nabisco, Inc. v. NLRB, 479 F.2d 770, 773 (2d Cir. 1973), both concerning decisions to defer to arbitration proceedings under the policy set in Collyer Insulated Wire, 192 N.L.R.B. 837 (1971).
 
 
 [4]
 Although we do not reach the merits of the Board's reasoning, we note that the Board expressly rejected the ALJ's finding that the companies had "directly pressured the salesmen to collect C.O.D. payments," and relied instead on its decision in Yellow Cab Co., 229 N.L.R.B. 1329 (1977), for the conclusion that "where an employer knowingly utilizes the force of circumstances to control the conduct of its employees, the failure to control them with direct orders may become legally insignificant." The Board's order in Yellow Cab, however, was denied enforcement by the District of Columbia Circuit Court, see Local 777, Democratic Union Organizing Committee v. NLRB, 603 F.2d 862, 872-81 (D.C.Cir.1978). The Board's cursory analysis of this point thus seems nearly as questionable as its construction of the arbitrator's award