**BAKERY, CONFECTIONERY AND TOBACCO WORKERS INTERNATIONAL UNION 25, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent, Pet Incorporated, Bakery Division, Intervenor.**

**No. 83–1416.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 25, 1984.

Decided March 27, 1984.

James B. Coppess, Atlanta, Ga., for petitioner.

Sue Gunter, Atty., N.L.R.B., Washington, D.C., with whom Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., was on brief for respondent.

Michael C. Towers, Atlanta, Ga., for intervenor.

Before SCALIA and STARR, Circuit Judges, and GESELL,[*] United States District Judge for United States District Court for the District of Columbia.

Opinion for the Court filed by District Judge GESELL.

GESELL, District Judge.

This is a petition by the Bakery, Confectionery and Tobacco Workers International Union Local 25 (Union) for review of a decision and order of the National Labor Relations Board (Board). The dispute concerns work rules relating to excused and unexcused absences promulgated by the employer, Pet Incorporated, Bakery Division (Pet), which has intervened in this action. The Union argues that the work rules at issue constituted a unilateral modification of the collective bargaining agreement then in effect, thus violating section 8(a)(5) and (d) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5), (d). Pursuant to a mandatory arbitration provision in the agreement this question was submitted to an arbitrator, who denied the grievance against Pet. After issuance of a complaint by the Regional Director for Region 10 of the Board, the matter was then heard by an Administrative Law Judge (ALJ), who recommended that the Board defer to the decision of the arbitrator. In a three-to-two decision, the Board adopted this recommendation and the administrative complaint was dismissed. This appeal followed. Because we conclude that the

Board's decision does not constitute an abuse of discretion, we affirm.

BACKGROUND

The Union and Pet have been parties to a series of collective bargaining agreements dating back to 1971 and had maintained a harmonious relationship for several years prior to the controversy at issue. The particular agreement in effect when this controversy arose covered a period of approximately three years, commencing on May 23, 1978. That contract contained a "no-strike" clause and provided that questions "of interpretation or application of any of the provisions" of the agreement were subject to mandatory arbitration. It also contained a general provision, carried over without change from the preceding agreement, which governed excused and unexcused absences.[1]

> SECTION 5.10. If an employee is to be absent for any reason he should notify the Company or his supervisor before his shift begins, if possible. If he fails to notify the Company he shall be charged with an unexcused absence.
>
> Three (3) unexcused absences within a one-year period shall be the basis for discharge. Excessive excused absences will be basis for discipline, up to and including discharge.

A work rule which had been in effect since approximately 1973 provided that "[a]n employee who is late for work or who will be absent from work must call his Supervisor at least one (1) hour before his scheduled starting time."

In July, 1978, Pet proposed a revised set of work rules which included new provisions governing absenteeism and tardiness. The Union objected to the new provisions, and consideration of the proposed rules was deferred. The new rules were raised again in March, 1979, and the Union renewed its objections. A period of negotia-

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. The Union had made attempts to renegotiate the number of allowable unexcused absences but, after the company rejected the Union's initial proposal, the matter was not pursued further.

tion followed, during which Pet made significant concessions.[2] A bargaining impasse was reached, however, and on May 31, 1982, the Union formally rejected the proposed rules on the ground that they violated Section 5.10 of the collective bargaining agreement. On June 1, 1982, Pet implemented the new rules over the Union's objections, and a wildcat strike broke out the same day. Ninety-eight strikers who refused to return to work were subsequently discharged by Pet pursuant to the agreement's no-strike clause.

The provisions of the new work rules which prompted the strike provided:

All absences are considered as unexcused absences unless specifically excused by supervisors. In the event an employee is going to be absent for any reason he must notify the Company at least one hour before his scheduled starting time. Failure to do so will make the absence unexcused regardless of the reason for the absence....

Excessive Absenteeism for Any Reason: Excessive absenteeism occurs when an employee is absent more than ten occurrences in a year for any reason, whether or not an absence is excused or unexcused. The management will take into account if the absence is caused by a temporary illness whose existence has been established beyond all doubt.

The Union filed a grievance addressed to the new work rules and the termination of striking employees. The arbitrator who heard the grievance found that the company had negotiated with the Union in good faith until an impasse was reached,[3] that the new work rules did not conflict with the negotiated agreement, and that hence the discharge of striking employees for violating the agreement's no-strike clause was legal. FMCS Case No. 79K/24447 (1980) (Dallas, Arb.).

The Regional Director for Region 10 thereafter issued a complaint raising the contentions put forth by the Union. The matter was fully heard by the ALJ, who held that the arbitrator's finding that the work rules were not in conflict with the agreement was "a reasonable and arguable one which does not appear to be clearly at odds with Board precedent or otherwise repugnant to the Act," and hence the arbitrator's decision was entitled to deference; the ALJ therefore recommended that the complaint be dismissed. Case No. 10–CA–14750, at 13 (1981).

By a three-to-two vote the full Board adopted the recommendations of the ALJ. The Board concluded that the arbitrator's findings were "consistent with Board precedent" and that there was "no basis for concluding that [ ] a tightening of the work rules necessarily results in a modification of the collective-bargaining agreement." The Board concluded that under such circumstances deferral to the arbitrator's findings was warranted, and dismissed the complaint. 264 N.L.R.B. No. 166, at 8–10 (1982).

## DISCUSSION

The issue on appeal is whether the Board reasonably exercised its discretion in deferring to the arbitrator. The Union urges that in so deferring the Board abused its discretion by endorsing an award repugnant to the purposes and policies of the Act.

In its seminal decision, *Speilberg Mfg. Co.*, 112 N.L.R.B. 1080 (1955), the Board announced that it would defer to an arbitration award where the proceedings before the arbitrator were fair and in accord with procedural regularity, the parties had agreed to be bound, and the decision of the arbitrator was not clearly repugnant to the purposes and policies of the Act. This holding recognized long-standing national

---

**2.** Pet agreed to increase the proposed number of excused absences considered "excessive" from seven to ten, and to give each employee a "clean slate" of no charged absences upon implementation of the new rules.

**3.** This conclusion is not contested on appeal and need not be discussed further.

policy favoring resolution of labor disputes through arbitration.[4] The approach taken by the Board in *Spielberg* has been approved by this Court in the past, and remains the law today. *Associated Press v. NLRB*, 492 F.2d 662, 667 (D.C.Cir.1974). The Board's views in this area have been very recently reinforced and to some extent clarified in *Olin Corporation*, 268 N.L.R.B. No. 86 (1984), in the following terms:

[W]e adopt the following standard for deferral to arbitration awards. We would find that an arbitrator has adequately considered the unfair labor practice if (1) the contractual issue is factually parallel to the unfair labor practice issue, and (2) the arbitrator was presented generally with the facts relevant to resolving the unfair labor practice. In this respect, differences, if any, between the contractual and statutory standards of review should be weighed by the Board as part of its determination under the *Spielberg* standards of whether an award is "clearly repugnant" to the Act. And, with regard to the inquiry into the "clearly repugnant" standard, we would not require an arbitrator's award to be totally consistent with Board precedent. Unless the award is "palpably wrong," i.e., unless the arbitrator's decision is not susceptible to an interpretation consistent with the Act, we will defer. [Footnotes omitted.]

268 N.L.R.B. No. 86, at 5.

■ In the present circumstances the contractual issue presented is parallel to the unfair labor practice issue. Under § 8(a)(5) and (d) of the Act, a unilateral attempt to modify the terms of a collective bargaining agreement constitutes an unfair labor practice. A mere "interpretation" or "fleshing out" of a contract through implementation of work rules does not, however, unless it conflicts with the contract. *See PPG Industries, Inc.*, 245 N.L.R.B. 1290,

1291 (1979). Whether a statutory violation has occurred therefore turns on whether the work rules are inconsistent with the collective bargaining agreement.

■ Considerable deference is due to an arbitrator's conclusions regarding contract interpretation; the meaning of a collective bargaining agreement "is the very stuff of labor contract arbitration." *District 119E, National Union of Hospital and Health Care Employees v. NLRB*, 613 F.2d 1102, 1109 (D.C.Cir.1979). This is so even where, in a case such as this, the interpretation of a labor agreement determines whether an unfair labor practice has occurred in violation of the Act. "[W]hen the unfair labor practice charge rests on factual issues of contract interpretation the arbitrat[or] is in as good if not better position than the Board to resolve those issues." *Bloom v. NLRB*, 603 F.2d 1015, 1020 (D.C.Cir.1979).

■ The Union argues, however, that in the present case the arbitrator's finding that the work rules are not inconsistent with the contract is contrary to established Board precedent and under such circumstances deference to his decision is not warranted and constitutes an abuse of discretion. Relying primarily on *Murphy Diesel Co., Inc.*, 784 N.L.R.B. 757 (1970), *enforced*, 454 F.2d 303 (7th Cir.1971), the Union contends that a contract modification necessarily occurs whenever an employer imposes a "rigid" set of rules in place of "flexible" rules developed by collective bargaining. The Union misinterprets this precedent. *Murphy Diesel* involved a failure to bargain in good faith and imposition of a "nongrievable" condition that directly conflicted with the labor contract. As the ALJ and the Board's majority pointed out, neither circumstance is present in the instant case. The work rules were bargained to an impasse, and Pet has never contested the Union's right to grieve application of

---

**4.** Section 203(d) of the Act, 29 U.S.C. § 173(d), states in part:

Final adjustment by a method agreed upon by the parties is declared to be the desirable method for the settlement of grievance disputes arising over the application or interpretation of an existing collective bargaining agreement....

*See also Republic Steel Corp. v. Maddox*, 379 U.S. 650, 653, 85 S.Ct. 614, 616, 13 L.Ed.2d 580 (1965).

the work rules to a particular case. No Board precedent holds, as the Union would suggest, that work rules interpreting contract terms in more "rigid" and less "flexible" terms cannot constitute a "fleshing out," and necessarily violate the contract.

The Arbitrator found that Pet's promulgation of work rules defining "excessive" excused absences in section 5.10 of the agreement and defining when an absence is unexcused was merely an elaboration of the agreement and not an attempt to modify it. That aspect of the new rules which least lends itself to characterization as an elaboration of the contract is the fact that the provision requiring advance notification of absence does not contain the qualification "if possible" which appears in the contract. The company asserts, however, that this qualification was fairly understood, since the practice had been to make such an exception under the prior rules which were in effect both before and after the contract was concluded, and which similarly did not contain an express "if possible" exception. The Union had never asserted that this aspect of the prior rules violated the contract; nor was that one of the grounds for its refusal to accept the new ones.

While differing views of the meaning of the work rules and the contract are possible, it cannot be said that the arbitrator's determination had no support given the factual background presented and the language of the rules and the agreement. His conclusion that no alteration of the contract and hence no violation of the Act existed was thus not "palpably wrong." *Olin Corporation, supra* at 5, and cases cited therein at fn. 7. The Board acted within its proper discretion, therefore, in adopting the ALJ's conclusion that the arbitrator's decision was not clearly repugnant to the Act, the standards for deferral enunciated in *Spielberg* had thus been met, and the arbitrator's decision should not be overturned. Accordingly, the petition for review of the Board's decision is denied, and the Board's order is AFFIRMED.