Adam BLOOM, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

United Parcel Service, Inc., Intervenor.

No. 78–1062.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 17, 1979.

Decided Aug. 9, 1979.

As Amended Aug. 17, 1979.

William N. Anspach, Washington, D. C., for petitioner.

Robert G. Sewell, Atty., N. L. R. B., Washington, D. C., with whom John S. Irving, General Counsel, Carl L. Taylor, Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., were on the brief, for respondent.

James D. Crawford, Philadelphia, Pa., with whom Howard J. Kaufman, Bernard G. Segal and Martin Wald, Philadelphia, Pa., were on the brief, for intervenor.

Before McGOWAN and MacKINNON, Circuit Judges, and OBERDORFER,* United States District Judge, United States District Court for the District of Columbia.

Opinion for the Court filed by MacKINNON, Circuit Judge.

MacKINNON, Circuit Judge:

Deferring to a decision by an arbitration panel which upheld the suspension and subsequent discharge of petitioner Adam Bloom for his refusal to work as directed by his superiors at the United Parcel Service, Inc. (UPS), the National Labor Relations Board (Board) dismissed Bloom's complaint that UPS had committed an unfair labor practice in violation of section 8(a)(1) and (3) of the National Labor Relations Act, as amended, 29 U.S.C. § 158(a)(1), (3) (1976).[1] The issue here is whether the Board properly deferred to the arbitration panel's decision. We hold that the Board's action was proper, and we accordingly deny the petition to set aside its order.[2]

## I

The facts of this case are largely undisputed. UPS is engaged in the business of storing, handling, and delivering parcels. It operates a terminal and warehouse at Arbutus, Maryland. UPS and the Truck Drivers, Helpers, Taxicab Drivers, Garage Employees and Airport Employees Local Union 355 (Union),[3] together with some twenty other locals, are parties to a collective bargaining agreement known as the Atlantic Area Parcel Agreement (Agreement). Article 7 of the Agreement provides that "there shall be no strike, lockout, tieup, or legal proceedings without first using all possible means of settlement, as provided for in this Agreement, of any controversy which might arise." Appendix (App.) at 25A. Article 7 establishes a grievance procedure for settling disputes, culminating in an arbitration panel whose decision is binding on the parties.

Article 18 of the Agreement provides: The Employer shall not require employees to take out on the streets or highways any vehicle that is not in safe operating condition or equipped with the safety appliances prescribed by law. It shall not be a violation of this Agreement where employees refuse to operate such equipment unless such refusal is unjustified.

. . .

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. Section 8 provides:
   (a) Unfair labor practices by employer
   It shall be an unfair labor practice for an employer—
   (1) to interfere with, restrain, or coerce employees in the exercise of rights guaranteed in section [7 of the Act, 29 U.S.C. §] 157 . . . .;

    (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . . .

2. Our jurisdiction derives from section 10(f) of the Act, 29 U.S.C. § 160(f) (1976).

3. The Union is affiliated with the International Brotherhood of Teamsters, Chauffeurs, and Helpers of America.

. . . The employer shall not ask or require any employee to take out equipment that has been reported by any other employee as being in unsafe operating condition until same has been approved as being safe by the automotive maintenance department where such department exists.

App. at 26–27.

At the time this controversy arose, Bloom was a member of the Union and had been employed by UPS since 1971. In 1973 Bloom began operating tractor-trailer equipment out of UPS's Arbutus terminal. On the afternoon of January 29, 1976, he reported to work at the Arbutus terminal and, after turning down the first tractor offered him,[4] was assigned by the dispatcher to drive tractor No. 21624. In accordance with Department of Transportation regulations[5] and UPS policy, Bloom conducted a pre-trip inspection of this tractor. Based on his visual observations, Bloom concluded, in general, that the tractor's tires were worn, with bald and flat spots and uneven and different tread patterns, and, in particular, that the left front tire had a tread depth less than the legally required 4/32 of an inch.[6]

Bloom returned to the dispatcher's office to report these observations and request a different vehicle. He was met there by his superior, James Rast, who went out to inspect the vehicle himself. Rast concluded that although the tires had a different tread pattern, they appeared to meet all applicable regulations. After checking with the manager of the automotive maintenance department, who assured him that different tread patterns posed no safety hazard, Rast ordered Bloom to take the vehicle.

Bloom refused. Rast called his superior, Feeder Manager Larry Grizzle, and reported Bloom's refusal to drive his assigned vehicle. Grizzle directed the automotive maintenance department manager, Don Kibler, and two other employees of that department to meet him in the dispatcher's office.[7] Bloom, meanwhile, summoned shop steward Tom Waddell, who conducted his own inspection of the vehicle and agreed with Bloom that the tires were unsafe. Waddell reported his conclusions to Grizzle.

Grizzle told the automotive maintenance department employees to examine the tractor tires. Using tire gauges, each concluded that the tread depth was greater than the legally required 4/32 of an inch, and declared that the tires were otherwise safe for operation. Grizzle reported these findings to Bloom and ordered him to take the tractor on his assigned route. Bloom again refused. He offered to drive another vehicle, but would not take tractor No. 21624. Grizzle warned Bloom that if he persisted in his refusal to take the tractor, Grizzle would have no choice but to suspend him. Waddell advised Bloom to take the tractor, and Bloom at first agreed. He changed his mind, however, and Grizzle thereupon suspended him.[8]

4. Bloom had heard that the first tractor had a steering problem and requested another vehicle. The dispatcher accommodated.

5. Department of Transportation regulations require:

No motor vehicle shall be driven unless the driver thereof shall have satisfied himself that the following parts and accessories are in good working order, nor shall any driver fail to use or make use of such parts and accessories when and as needed:

. . . . .

Tires.

49 C.F.R. § 392.7 (1976), *reprinted in* Appendix (App.) at 30.

6. *See id.* § 393.75, App. at 31.

7. Under the Atlantic Area Parcel Agreement the automotive department is responsible for ensuring the safety of the vehicles. *See* App. at 27.

8. The record indicates that the automotive maintenance department immediately thereafter conducted a thorough inspection of the tractor and its tires and again found that all the tires complied with applicable regulations and were otherwise safe. Waddell also conducted another inspection and persisted in his contrary conclusion. The record before the administrative law judge reveals that after the incident involving Bloom, other UPS employees safely operated tractor No. 21624 with the same tires in issue here on numerous occasions. For whatever reason, none of these drivers lodged complaints about the tires.

Bloom filed a grievance with the Union in which he charged that he was suspended in violation of Article 18 of the Agreement. At a grievance meeting held several days after the incident, Bloom met with Grizzle, Kibler, and Division Manager Albert Hobbs as well as Waddell and the Union's business agent, John Sullivan. Much of the discussion involved contractual rights and obligations. The UPS representatives repeatedly insisted that the tires on tractor No. 21624 had been carefully examined and found to be safe by the automotive maintenance experts. Bloom continued to maintain that the driver involved should be the judge of whether a vehicle was safe. On three occasions during this meeting, Hobbs offered to reinstate Bloom if he would drive the tractor. Three times, Bloom refused. At the third refusal, Hobbs discharged Bloom.

In accordance with the grievance procedure outlined in the Agreement, Bloom's complaint was submitted to an arbitration panel composed of three representatives of the Union and three representatives of UPS. There was a complete presentation of the evidence. Hobbs represented UPS; Sullivan represented Bloom. The day following the hearing, the panel announced its decision to uphold Bloom's discharge. The panel found that "[t]here have been no facts presented to indicate any violations of Article 18" and that Bloom's "continued refusal to work as directed was just cause for discharge." App. at 44.

Four months later, Bloom lodged a complaint with the Board. At a hearing before an administrative law judge in December 1976, UPS and Bloom submitted the same evidence which had been presented to the arbitration panel.[9] In June 1977, the administrative law judge issued a decision in which he concluded that because Bloom had acted on the reasonable belief that the tractor tires were unsafe, his activity in refusing to drive the vehicle was concerted and protected under section 7 of the National Labor Relations Act, 29 U.S.C. § 157 (1976).[10]

UPS filed exceptions to the Board, arguing that the administrative law judge erred in failing to defer to the arbitration panel's decision. The Board agreed. In a decision issued in October 1977, the Board invoked the doctrine established in *Spielberg Manufacturing Company*, 112 N.L.R.B. 1080 (1955), which requires "giving binding effect to arbitral decisions made in conformity with" the criteria provided therein. The Board found that the arbitration panel that had heard Bloom's complaint met the *Spielberg* criteria, and accordingly dismissed Bloom's complaint in its entirety.[11] The Board said that "[t]he fact that the arbitration panel reached a result contrary to that of the Administrative Law Judge does not warrant a departure from the [*Spielberg*] policy." App. at 4.

This petition ensued.

## II

■ The existence of an arbitration award does not oust the Board of its juris-

---

9. There was some additional evidence offered to the administrative law judge, particularly relating to whether the tires on tractor No. 21624 were indeed safe. The evidence regarding Bloom's refusal to work and the circumstances surrounding that refusal was, however, the same as that presented to the arbitration panel. We do not understand Bloom to argue otherwise.

10. Section 7 provides:
Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activi-

ties except to the extent that any such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section [8, 29 U.S.C. §] 158(a)(3) of this title.

11. One member of the three-member panel of the Board dissented in part. He argued that deference to the arbitration panel's decision was inappropriate because its composition, lacking a neutral member, was not "fair and regular." He concurred in the dismissal of Bloom's complaint, however, stating that on the merits Bloom's refusal to work in violation of contractual provisions was not concerted and protected by section 7. App. at 6 (Member Jenkins, dissenting in part).

diction to adjudicate claims of unfair labor practices based on the same subject matter as the award. *National Labor Relations Board v. Strong Roof & Insulating Co.*, 393 U.S. 357, 360–61, 89 S.Ct. 541, 21 L.Ed.2d 546 (1969); *see* 29 U.S.C. § 160(a) (1976). The Supreme Court has made clear, however, that "it is equally well established that the Board has considerable discretion to respect an arbitration award and decline to exercise its authority over alleged unfair labor practices, if to do so will serve the fundamental aims of the [National Labor Relations] Act." *Carey v. Westinghouse Electric Co.*, 375 U.S. 261, 271, 84 S.Ct. 401, 409, 11 L.Ed.2d 320 (1963). The fundamental intent of the National Labor Relations Act as amended is to minimize industrial strife and promote industrial stability through collective bargaining. This intent is furthered by the encouragement of collective bargaining agreements that require the submission of contractual disputes to final and binding arbitration between the parties.[12] *See John Wiley & Sons v. Livingston*, 376 U.S. 543, 549, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964); *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 578, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960).

As part of its efforts to advance the arbitral process, the Board has long deferred to arbitration awards in cases in which (1) the arbitration proceedings appear to have been "fair and regular"; (2) all parties have agreed to be bound by the arbitration; and (3) the arbitration award is not clearly repugnant to the policies of the National Labor Relations Act. *Spielberg Manufacturing Co., supra*, at 1082. Supporting this deference is the recognition that if disputants believed the Board would give *de novo* consideration to issues fit for arbitration the submission to grievance and arbitration of controversies which might involve unfair labor practices would be greatly discouraged. Thus by declining to exer-

cise its unfair labor practice jurisdiction in these cases, the Board in effect holds the parties to their bargained-for resolution of the dispute, reinforces the important role of arbitration in the collective bargaining process, and avoids unnecessary duplicative consideration of the same issues by numerous different bodies. Courts have generally endorsed the policies underlying the *Spielberg* doctrine. *See, e. g., Arnold Co. v. Carpenters District Council*, 417 U.S. 12, 16–17, 94 S.Ct. 2069, 40 L.Ed.2d 620; *Carey v. Westinghouse Electric Co., supra*, at 270–72, 84 S.Ct. 401; *National Labor Relations Board v. Auburn Rubber Co.*, 384 F.2d 1, 3 (10th Cir. 1967); *Ramsey v. National Labor Relations Board*, 327 F.2d 784, 786–88 (7th Cir.), *cert. denied*, 377 U.S. 1003, 84 S.Ct. 1938, 12 L.Ed.2d 1052 (1964).

Recognizing that discouragement of the arbitral process "would be contrary to the Supreme Court's efforts to effectuate the congressional desire to support 'administrative techniques for the peaceful resolution of industrial disputes,'" this court expressed approval of the *Spielberg* doctrine in *Associated Press v. National Labor Relations Board*, 160 U.S.App. 396, 401, 492 F.2d 662, 667 (1974) (quoting *Boys Markets, Inc. v. Retail Clerks Union Local 770*, 398 U.S. 235, 251, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). In that case, we held that because the "merits of the unfair labor practice charges . . . turned on [the] contractual issue" settled by the arbitration panel, the Board had the discretion to refuse to exercise its jurisdiction once it was assured that the arbitration proceedings were procedurally fair and did not result in an award repugnant to the purposes of the National Labor Relations Act. *Id.* 160 U.S.App.D.C. at 400–01, 492 F.2d at 666–67. We reiterated this approval in *Local 2188, I.B.E.W. v. National Labor Relations Board*, 161 U.S. App.D.C. 168, 171–72, 494 F.2d 1087, 1090–91 (1974), as it applied to the pre-arbitral setting. In that case, we emphasized that

---

12. Section 203(d) of the Labor Management Relations Act of 1947 provides:

Final adjustment by a method agreed upon by the parties is [hereby] declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective bargaining agreement.

29 U.S.C. § 173(d) (1976).

the "congruence between the contractual dispute and the overlying unfair labor practice charge is significant," for in its absence "the Board's abstention might . . . constitut[e] not deference, but abdication." *Id.* 160 U.S.App.D.C. at 401, 492 F.2d at 667.

In *Banyard v. National Labor Relations Board*, 164 U.S.App.D.C. 235, 505 F.2d 342 (1974), we focused on this last requirement that the contractual dispute resolved by the arbitration panel and the unfair labor practice charge considered by the Board materially overlap. The purpose of the *Spielberg* doctrine is to avoid undue intrusion on the grievance and arbitration process. If the arbitration panel did not or could not decide the statutory issue embodied in the unfair labor practice charge, then examination of the charge by the Board causes no undue disruption of arbitration process. An employee does not waive his statutory right to be free from unfair labor practices by virtue of his being a party to a collective bargaining agreement with an arbitration clause; he is entitled to a forum in which his complaint is fully and fairly aired. If the arbitration panel does not or cannot provide that forum, then the employee does not undermine bargained-for dispute-resolution mechanisms by going to the Board. Hence the *Banyard* court held that deference to the arbitrator's decision is appropriate only if the record reveals that the arbitration panel "clearly decided" the unfair labor practice charge and that charge is "within the competence" of the panel to decide. *Id.* 164 U.S.App.D.C. at 240, 505 F.2d at 347; *accord, Stephenson v. National Labor Relations Board*, 550 F.2d 535 (9th Cir. 1977).

█ This case does not require us to identify the precise contours of the *Banyard* requirements beyond emphasizing two points. First, although the record must yield clear indications that the arbitration panel specifically dealt with the issues underlying the unfair labor practice charge, it

is not necessary for arbitrators to set out their reasoning on the statutory issue in a written memorandum. A written document is clearly the preferred route, for it enhances the ability of the Board and a court to satisfy itself that the prerequisites to deference have been met. The key, however, is the evidence presented to the arbitration panel. If the record contains substantial and definite indications that the unfair labor practice issue and its supporting evidence were expressly presented to the arbitration panel, and the panel's decision reflects its reliance on that evidence, then the Board and a court can determine whether the panel clearly decided the statutory issue.

█ Second, while no vivid line divides issues plainly within the competence of an arbitration panel from those plainly outside, it can at least be said that when the unfair labor practice charge rests on factual issues of contract interpretation the arbitration panel is in as good if not better position than the Board to resolve those issues.[13] The collective bargaining agreement exhibits the parties' judgment that the arbitration panel is expert on questions of contract interpretation and application. When the merits of the unfair labor practice complaint pivot on those factual issues—that is, when the statutory question primarily involves factual rather than legal issues— then deference to the arbitration panel is entirely appropriate. This is one reason why the *Local Union 2188* court found so significant the congruence between the statutory and contractual questions.

### III

█ Bloom argues that the record does not show that the arbitration panel "clearly decided" the statutory question of whether he was discharged for attempting to enforce contractual rights. We disagree.

The basic question in both the contractual and statutory settings was the same: was

---

13. In *Banyard*, for example, one of the questions involved interpretation of an Ohio state law prohibiting the overloading of vehicles. The court's review of the record did "not indi-

cate that the [arbitration panel's] judgment was exercised at all on the crucial issues regarding violation of the Ohio statute." 505 F.2d at 347.

Bloom justified under the contract to refuse to operate tractor No. 21624? Resolution of this question turns on interpretation of the contract. In undertaking to interpret the contract, the arbitration panel heard all the evidence of the circumstances surrounding Bloom's inspection of the vehicle, the automotive maintenance department's evaluation of the vehicle, Grizzle's discussions with Bloom and the events at the grievance meeting. It examined Articles 36 [14] and 18 of the Agreement, provisions which parallel the statutory questions involved, and arrived at a judgment based on this evidence. Although the text of its decision is brief, the decision specifically refers to the lack of evidence to support Bloom's claim that he was attempting to enforce Article 18 of the Agreement. It also expressly notes that UPS had "just cause" under the agreement to discharge Bloom. The detailed minutes of the arbitration hearing which accompanied the panel's decision reveal that the evidence presented to the panel was basically the same evidence later presented to the Board.

In light of these factors we have no difficulty holding that the requisite congruence between the contractual and statutory issues was present and that the panel clearly resolved the necessary questions. This case stands in sharp contrast to *Banyard*, in which the court was unable to say that the arbitration panel had even considered, let alone decided, an important element of the statutory question. Moreover, it differs from *Banyard* in the compatibility of the questions involved with the composition of the panel. The contractual and statutory issue to be resolved here hinged on factual considerations relating to the safety of the tires on the tractor, and Bloom's contractual rights and obligations with respect thereto.

The arbitration panel was composed of representatives of management and labor, all of whom presumptively possessed an intimate familiarity with these factual issues. It was therefore well within the competence of the arbitration panel to pass on the questions presented to it.

There is no dispute that all the parties agreed to be bound by the arbitration. The record contains no indication that the arbitration process invoked here was other than "fair and regular." However the bipartite grievance panel lacking a neutral member may operate in other circumstances, it satisfies the requirements of composition that the Agreement set forth and does not appear to have infected these proceedings in such a way as to render deference inappropriate.[15] *See General Drivers, Warehousemen & Helpers, Local Union No. 89 v. Riss & Co.*, 372 U.S. 517, 519, 83 S.Ct. 789, 9 L.Ed.2d 918 (1963); *Nabisco, Inc. v. National Labor Relations Board*, 479 F.2d 770, 772 (2d Cir. 1973). Nor does Bloom offer any reason why the result reached by the arbitration panel should be deemed repugnant to the policies of the National Labor Relations Act.

Having considered the complete record and examined all of petitioner's claims, we can find no basis for vacating the Board's order. We therefore deny the petition to set that order aside. It is

*So ordered.*

---

14. Article 36 prohibits discriminatory practices by the employer. *See* App. at 28–29; *cf.* note 1 *supra*.

15. Article 7 provides that if the majority of the arbitration panel is unable to agree, "then the grievance shall be submitted to the Federal Mediation and Conciliation Service by either or both parties." App. at 25B. No dissent was recorded in the arbitration panel's consideration of Bloom's grievance.