**PLUMBERS AND PIPEFITTERS LOCAL UNION NO. 520, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**UE & C–Catalytic, Inc., Intervenor.**

No. 91–1098.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 10, 1991.

Decided Feb. 11, 1992.

sion in the absence of a challenge by one of the parties.

James L. Cowden, with whom P. David Lopez was on the brief, for petitioner. David R. Straus also entered an appearance for petitioner.

William M. Bernstein, Attorney, National Labor Relations Board, with whom Jerry M. Hunter, General Counsel, D. Randall Frye, Acting Deputy General Counsel and Aileen A. Armstrong, Deputy Associate General Counsel, were on the brief, for respondent. Charles P. Donnelly, Attorney, N.L.R.B., also entered an appearance for respondent.

Francis M. Milone and Valerie I. Harrison were on the brief, for intervenor. Stanley F. Lechner also entered an appearance for intervenor.

Before MIKVA, Chief Judge, EDWARDS and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

The simple question in this case is whether the National Labor Relations Board ("NLRB" or "Board") may give deference to a pre-arbitration settlement reached by an employer and a union disposing of an employee's contract grievance with respect to a matter covered by the parties' collective bargaining agreement. The simple answer is yes.

In this case, the applicable collective bargaining agreement between UE & C–Catalytic, Inc. ("Catalytic") and fourteen International building trades unions—the General Presidents' Project Maintenance Agreement ("GPPMA")—prohibits work stoppages and provides that an employer may discharge or discipline employees for "proper cause." In 1985, Catalytic fired Garland Berry, a union steward with the petitioner,

Plumbers and Pipefitters Local Union No. 520 ("Local 520"), for insubordination in connection with a threatened work stoppage. In protest against Berry's dismissal, Local 520 filed a grievance under the collective bargaining agreement and an unfair labor practice ("ulp") charge with the NLRB; the factual circumstances underlying the grievance and the ulp were exactly the same. The contract grievance dispute was thereafter settled in lieu of arbitration, with an agreement between representatives from Catalytic and the International Union providing for Berry's reinstatement without backpay. Subsequently, during proceedings at the NLRB, an Administrative Law Judge ("ALJ") refused to grant deference to the settlement agreement and found for Berry on the merits, ordering his reinstatement *with* backpay. The Board reversed the ALJ and held that deference was appropriate. *Catalytic, Inc.*, 301 N.L.R.B. No. 44 (Jan. 28, 1991), *reprinted in* Deferred Appendix ("App.") 11.

We uphold the Board's decision and deny the petition for review. We find that the Board's policy of granting deference to pre-arbitration settlement agreements is consistent with the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 151–169 (1988), and that the Board did not abuse its discretion by applying the policy in this case. In denying the petition for review in this case, however, we do not mean to suggest that the Board's opinion is without flaws. Indeed, as indicated during the oral argument before this panel, the Board's present policy on "deference"[1] is vacuous in significant respects, because it lacks any coherent theoretical basis. Although remand is unnecessary in this case because deference to the settlement agreement was clearly permissible on the record before us, the Board will be well-advised to reconsider the basis for its deference policy in order to avoid the need for remand in future cases.

## I. BACKGROUND

### A. *The Underlying Incident*

Catalytic is an engineering contractor which performs various maintenance services for industrial plants and utilities. Catalytic's craft employees are covered by a collective bargaining agreement known as the General Presidents' Project Maintenance Agreement.[2] The GPPMA is negotiated on a nationwide basis; its signatories are fourteen International building trade unions and several engineering contractors, including Catalytic. With the exception of wage rates, certain benefit packages and hiring hall practices (all of which are negotiated by the Local unions), the national agreement covers most conditions of employment for craft employees in the designated bargaining units. The Local unions are not signatories to the GPPMA; however, each Local is affiliated with one of the signatory International unions. Thus, although the Locals monitor compliance with the terms of the GPPMA, the affiliated International is the recognized bar-

---

1. The Board historically has followed two separate policies of adjudicatory restraint, both of which have been referred to as "deferral" policies: one is the so-called "post-arbitral deferral" or *"Spielburg"* policy, pursuant to which the Board *grants deference* to arbitration decisions rendered through the grievance processes of collective bargaining agreements if certain conditions are met, *see Spielburg Mfg. Co.*, 112 N.L.R.B. 1080 (1955); the other is the "pre-arbitral deferral" or *"Collyer"* policy, under which the Board *defers* (delays) consideration of unfair labor practice charges in certain circumstances until remedies under the applicable collective bargaining agreement have been exhausted by the complaining party, *see Collyer Insulated Wire*, 192 N.L.R.B. 837 (1971). *See also Hammontree v. NLRB*, 925 F.2d 1486, 1490–91 (D.C.Cir.1991) (en banc) (describing Board's "deferral" policies); part I.C., *infra* (describing

*Spielburg* policy). The Board policy at issue in this case—the granting of deference to pre-arbitration grievance settlements—is an outgrowth of the older *Spielburg* policy.

In *Hammontree*, we distinguished between the Board's "deferral" policies by referring to the *Spielburg* doctrine as a *"deference policy"* and to the *Collyer* doctrine as a *"deferment policy."* *See* 925 F.2d at 1490–91. For purposes of clarity, we will follow *Hammontree's* terminology in this opinion. Thus, we will refer to the policy at issue in this case as a policy of *deference.*

2. The GPPMA is designed to take account of the unique circumstances facing contractors like Catalytic, which operate a number of temporary projects at various work sites. *See Catalytic, Inc.*, 212 N.L.R.B. 471, 471–72 (1974) (describing history and function of GPPMA).

gaining representative for the employees in the designated local bargaining units. In this case, Local 520 is affiliated with the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada ("United Association"), which is a signatory to the GPPMA.

The GPPMA contains a no-strike provision which prohibits work stoppages and slowdowns by the unions and employees covered by the agreement. *See* GPPMA at 21–22, *reprinted in* App. 42. The Agreement also contains a management rights clause which provides, *inter alia,* that an employer may discharge or discipline employees "for proper cause." *Id.* at 5.

The events giving rise to the dispute in this case occurred at the Peach Bottom nuclear power plant in Delta, Pennsylvania, a facility owned by one of Catalytic's clients, the Philadelphia Electric Company ("PECO"). In the late summer of 1985, PECO decided to remove and repair the "snubbers" (large shock absorbers) at the Peach Bottom facility; Catalytic was awarded a contract to remove the snubbers, but the associated repair work was given to another contractor because of PECO's dissatisfaction with certain work previously done by Catalytic's pipefitters. Local 520 objected to this division of labor because it believed that the repair job should have been assigned to its pipefitters.

Catalytic decided that the most efficient way to remove the snubbers was to "split the shifts" of the eight pipefitters who were assigned to the job, with four working the usual day shift and the other four working the second shift. On Thursday, August 29, 1985, the foreman of the crew informed Garland Berry, the union steward, about the shift assignment, and told him that the work hours would go into effect on Tuesday of the following week. Berry relayed this information to August Hartinger, the Business Manager of Local 520. Citing safety concerns (but apparently motivated by his displeasure over the jurisdictional dispute), Hartinger advised Berry to tell the affected workers that the

union would not go along with the splitting of the shifts. On Friday, August 30, Berry told the eight workers that they should continue to report for the day shift as usual. One of the workmen asked Berry if he should ignore the foreman's instructions regarding working hours, to which Berry responded that the union's instructions should be obeyed. *See Catalytic, Inc.,* slip op. at 3.

When Catalytic's Labor Relations Manager, Neal Greeley, learned of Berry's actions, he contacted Frank DeLuca, the Pennsylvania representative of the United Association. The matter was resolved when DeLuca agreed that the union would man the shifts according to management's wishes in exchange for Greeley's promise to hold a meeting to discuss the jurisdictional dispute over the snubber work. The affected employees then reported to work as directed on Tuesday, September 3, and no work stoppage occurred.

On September 12, 1985, a meeting was held to discuss the work assignment dispute at PECO. The meeting focused more on Berry than on the snubber controversy, however. Greeley, representing Catalytic, stated that Berry would be terminated because management believed that, some days prior, he had threatened a welding inspector. The union disputed this allegation, which was disproved to Catalytic's satisfaction later the same day. Nonetheless, employer representatives continued to express their dissatisfaction with Berry, saying "he was too much of a trouble maker." Transcript of ALJ Hearing ("Tr.") at 25 (testimony of Mr. Hartinger). Berry's status was not resolved at the meeting. The next day, though, Catalytic's Site Manager, Lou McCauley, informed Berry that he was being terminated for gross insubordination, based upon his instruction to the snubber workers to ignore management's directions as to the shift split.

B. *The Grievance Procedure*

Subsequent to Berry's discharge, Local 520 filed a grievance, claiming that the employer had acted without cause; the Lo-

**748**

cal also filed an unfair labor practice charge against Catalytic, alleging that Berry had been terminated for engaging in protected union activity, in violation of sections 8(a)(1) and 8(a)(3) of the NLRA.[3] The NLRB did not act on the unfair labor practice charge until January 30, 1987, at which time the General Counsel issued a complaint; however, the grievance proceeded more promptly through the GPPMA grievance procedure.

The GPPMA establishes a four-step grievance and arbitration procedure for disputes arising under the contract. *See* GPPMA at 9–10. Step One of the process consists of a meeting between the aggrieved employee and/or a representative from the Local union and the employee's immediate supervisor. If the grievance is not resolved it proceeds to Step Two, at which a representative of the Local and a representative of the affiliated International Union consult with the employer's labor relations manager. If Step Two is unsuccessful, the grievance is referred in Step Three to the General Presidents' Committee ("GPC"), which includes a representative of each of the International Unions that are signatories to the GPPMA (there are no employer representatives). At Step Three of the process, representatives from the employer and the International Union responsible for the grievance are permitted to make oral and written presentations to the GPC. If the GPC and the employer are unable to reach agreement as to the appropriate disposition of the grievance within ten days after the hearing, either the employer or the International may invoke Step Four of the process, binding arbitration. *See id.*

The grievance procedure in this case began in late September 1985. The Step One meeting apparently produced no results. In October 1985, Hartinger, DeLuca and Berry traveled to the headquarters of the United Association in Washington, D.C., where they met with officials of the United Association in preparation for Step Two of the grievance process. Hartinger explained the facts, and Ed Moore, a United Association officer, called · Catalytic's Vice President, David McIntire, in an unsuccessful attempt to resolve the grievance.

The following week, the Step Two meeting was held in Washington. DeLuca and two other United Association officials were present at the meeting; Greeley and McIntire represented the company. The parties discussed Berry's dismissal and the related snubber controversy in detail, including the union's position that Berry was following union orders when he countermanded management's directive regarding the split shifts. *See Catalytic, Inc.,* slip op. at 5. The grievance was not resolved at that meeting.

On January 2, 1986, the United Association initiated Step Three of the grievance process by referring the matter to the GPC to be considered during its mid-January 1986 meeting. At the GPC meeting, Greeley presented Catalytic's case and submitted a written statement. The United Association's case was presented by a Mr. Coyne, who had been briefed on the Berry matter by DeLuca and apparently had received records of the two prior Washington meetings. Coyne made an oral presentation to the GPC and also submitted a written statement of the union's position. Tr. at 189.

On January 31, 1986, the GPC informed the parties of its decision:

At the last regular meeting of the General Presidents' Committee, a Step III grievance was reviewed involving Garland Berry, [a] member of UA Local # 520 [who was] terminated from the

---

**3.** Section 8(a) of the NLRA provides, in relevant part:

(a) It shall be an unfair labor practice for an employer—
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title [section 7 of the NLRA];

....

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization....

29 U.S.C. § 158(a) (1988).

Peach Bottom Nuclear Power Plant, Delta, Pennsylvania project.

After hearing statements from both parties and carefully examining all of the evidence submitted, it was the position of the Committee that Garland Berry should be made eligible for immediate rehire without any back pay.

Letter from Thomas Owens, Administrator of the GPC, to David McIntire, Catalytic, Inc. at 1 (Jan. 31, 1986), *reprinted in* App. 87. Both Catalytic and the United Association accepted this determination; as a result, the GPC's resolution of the grievance became final under the contract. *See* GPPMA at 10 (arbitration available "[i]n the event agreement is not reached" at GPC stage). When Hartinger learned of the outcome, he objected on Berry's behalf, but the United Association informed him that "[b]ecause of the agreement of the General Presidents' Committee, there is no further step as far as arbitration. The only time it goes to arbitration is when the committee cannot agree to a solution." Letter from Ed Moore, Assistant General President, United Association, to August Hartinger, Business Manager, Local 520 at 1 (Mar. 6, 1986), *reprinted in* App. 79.

C. *The Board's Decision*

On April 20, 1987, more than a year after the GPC decision, an ALJ hearing was commenced on Local 520's unfair labor practice charge. In his decision, the ALJ declined to give deference to the result of the grievance procedure on the ground that Berry and Local 520 objected to the GPC's resolution of the grievance. *See* ALJ Decision at 8–10, *reprinted in* App. 29. On the merits, the ALJ found that Berry had been discharged because of his union activity and that the gross insubordination charge was a pretext. *See id.* at 7–8. Based upon these conclusions, the ALJ ordered Berry reinstated with backpay.

The Board reversed the ALJ on the deference issue and dismissed the complaint. The Board reasoned that, under its decision in *Alpha Beta Co.*, 273 N.L.R.B. 1546 (1985) ("*Alpha Beta*"), *petition for review denied sub nom. Mahon v. NLRB*, 808 F.2d 1342 (9th Cir.1987), deference to the

pre-arbitration settlement of the Berry grievance was appropriate. *See Catalytic, Inc.*, slip op. at 7–8, 11–12.

The Board's policy of granting deference to pre-arbitration grievance settlements is a ⬆relatively recent outgrowth of its long-standing *Spielburg* doctrine, pursuant to which deference is given to grievance arbitration awards in certain circumstances. *See Spielburg Mfg. Co.*, 112 N.L.R.B. 1080 (1955). Under the *Spielburg* doctrine, as revised in *Olin Corp.*, 268 N.L.R.B. 573 (1984), the Board grants deference to an arbitration award where: (1) the arbitration proceedings appear to have been fair and regular; (2) all parties agreed to be bound; (3) the arbitrator's decision is not "clearly repugnant" to the purposes and policies of the NLRA; and (4) the arbitrator considered the unfair labor practice issue. *See id.* at 573–74; *Spielburg Mfg. Co.*, 112 N.L.R.B. at 1082. An arbitrator's decision is not "clearly repugnant" to the NLRA unless it is "palpably wrong"—that is, "not susceptible to an interpretation consistent with the Act"—and the burden is on the opponent of deference to show that the conditions for granting deference have not been met. *Olin Corp.*, 268 N.L.R.B. at 574, 577.

The Board expanded its *Spielburg/Olin* policy by applying it to pre-arbitration grievance settlements in *Alpha Beta*. There, a union filed a grievance and an unfair labor practice charge when twenty employees were dismissed during a sympathy strike. After the contractually-established grievance committee deadlocked, the union, with the consent of the affected employees, agreed to a settlement whereby the employees were reinstated without backpay. The NLRB gave deference to the settlement, holding that the "principles [of *Spielburg/Olin*] apply equally to settlements arising from the parties' contractual grievance/arbitration procedures." 273 N.L.R.B. at 1547. The Board ruled that it would evaluate grievance settlements under the four *Spielburg/Olin* criteria, except that the "clearly repugnant" criterion would be modified to reflect the differences between an arbitration award and a griev-

ance settlement. A settlement will not be deemed "palpably wrong" under the Act, the Board ruled, so long as it is arrived at through a process in which both sides make concessions. *See id.*

The Board's policy with respect to grievance settlements was further refined in *United States Postal Service*, 300 N.L.R.B. No. 23 (Sept. 28, 1990) ("*Postal Service*"). There, the Board granted deference to a grievance settlement entered into by the union and the employer over the grievant's objection. The Board ruled that a union may bind a unit employee to a settlement and waive his contractual and statutory rights, even absent his consent. *See id.*, slip op. at 5–6. The Board also clarified the application of the fourth deference criterion (consideration of the unfair labor practice charge) in settlement cases: "This criterion is satisfied when the contractual issue and the unfair labor practice issue are factually parallel, and the parties were generally aware of the facts relevant to resolving the unfair labor practice [claim]." *Id.* at 7.

In this case, the Board grounded its decision to grant deference on *Alpha Beta* and *Postal Service*. The Board began its analysis by finding, correctly in our view, that Catalytic's and the United Association's acquiescence in the GPC's resolution of the Berry grievance was "tantamount to a settlement agreement such as was involved in *Postal Service*." *Catalytic, Inc.*, slip op. at 9. The Board went on to conclude that the four *Alpha Beta/Postal Service* deference criteria were met in this case. *Id.* at 10–12. Rejecting the General Counsel's argument that it was inappropriate to give deference to a settlement to which Berry and Local 520 objected, the Board dismissed the complaint. *Id.* at 12. Local 520 now petitions for review of the Board's decision and order.

4. In *United Food & Commercial Workers Union, Local 23*, the Court held:

On a pure question of statutory construction, our first job is to try to determine congressional intent, using traditional tools of statutory construction. If we can do so, then that interpretation must be given effect.... However, where the statute is silent or ambiguous with respect to the specific issue, the question

## II. Discussion

 The scope of our review of the Board's decision and order in this case is relatively narrow. The Board's formulation of its deference policy must be upheld so long as it is rational and consistent with the NLRA. *See NLRB v. United Food & Commercial Workers Union, Local 23*, 484 U.S. 112, 123, 108 S.Ct. 413, 420–21, 98 L.Ed.2d 429 (1987);[4] *Hammontree v. NLRB*, 925 F.2d 1486, 1491 (D.C.Cir.1991) (en banc). The Board's decision to grant deference in a particular case may be reversed only for an abuse of discretion. *Bakery, Confectionery & Tobacco Workers Int'l Union 25 v. NLRB*, 730 F.2d 812, 813 (D.C.Cir.1984). We find that the Board's deference policy constitutes a permissible interpretation of the NLRA and that the Board did not abuse its discretion by applying the policy in this case; accordingly, we deny the petition for review.

### A. *The Board's* Alpha Beta *Deference Policy*

 The first issue that we must address is whether the Board's policy of granting deference to pre-arbitration grievance settlements constitutes a permissible construction of the NLRA. Local 520 does not strenuously contest the propriety of the policy, reserving its fire for the contention that the Board abused its discretion in applying the policy on the facts of this case. Nonetheless, we must address the policy's facial validity as a threshold matter because, if the policy is invalid, the Board necessarily abused its discretion in giving deference to the pre-arbitration settlement of the Berry grievance.

We begin our analysis by clarifying what is not in dispute in this case. First, Local

for the court is whether the agency's answer is based on a permissible construction of the statute. Under this principle, we have traditionally accorded the Board deference with regard to its interpretation of the NLRA as long as its interpretation is rational and consistent with the statute.

484 U.S. at 123, 108 S.Ct. at 421 (internal quotation marks and citations omitted).

520 does not challenge the legitimacy of the GPPMA's grievance procedure or its applicability in this case. Local 520 concedes that the matter at issue here—Catalytic's termination of Berry—is covered by the "proper cause" provision of Article II of the GPPMA and is subject to the GPPMA's grievance procedure. Indeed, it was Local 520 that invoked the grievance procedure on Berry's behalf. Thus, there is no dispute as to the fact that submission of the Berry matter to the GPC was entirely appropriate.

█ Local 520 also concedes, as it must, that the statutory right asserted by Berry in this case is within the category of rights that are subject to waiver by a union through the collective bargaining process. In *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 103 S.Ct. 1467, 75 L.Ed.2d 387 (1983), the Supreme Court made clear that many of the rights guaranteed to employees by the NLRA may be altered or waived by a union in collective bargaining, so long as the union fulfills its duty of fair representation and takes no action that would impair the employees' choice of their bargaining representative. *See id.* at 705–07, 103 S.Ct. at 1475–77; *American Freight Sys., Inc. v. NLRB*, 722 F.2d 828, 832 (D.C.Cir.1983) (*"American Freight"*) ("It is well settled that a union may lawfully waive statutory rights of represented employees in a collective bargaining agreement.").[5] Among the rights that may be modified or waived is the right to strike. *Metropolitan Edison Co.*, 460 U.S. at 705, 103 S.Ct. at 1475–76. A union thus may agree that, with respect to unit employees, the right to engage in a work stoppage is waived and that union officials may not encourage unit employees to take job actions in derogation of the no-strike clause.

*See id.* at 705–06, 103 S.Ct. at 1475–76. Local 520 admits that in this case, as in *Metropolitan Edison Co.*, the statutory right at issue—Berry's purported privilege to counsel unit employees to engage in a work stoppage by ignoring Catalytic's instructions regarding the shift split—is a right which the United Association could waive, either through contract negotiations or the grievance/arbitration process.[6] Thus, Local 520 concedes that the statutory right allegedly infringed in this case is one with respect to which it was permissible for Catalytic and the United Association to bargain.

Finally, Local 520 raises no challenge to the legal regime established by *Alpha Beta*, 273 N.L.R.B. 1546, and *Postal Service*, 300 N.L.R.B. No. 23. Under those cases, the Board will give deference to a pre-arbitration grievance settlement when: (1) the settlement is reached through a collective bargaining process which is "fair and regular"; (2) the parties agreed to be bound by the terms of the settlement agreement; (3) the outcome reached is not "palpably wrong," meaning that both sides have compromised to some degree; and (4) the unfair labor practice issue was "considered" in the settlement process, in that the contractual and unfair labor practice issues are factually parallel and both parties were generally aware of the relevant facts. *Postal Service*, slip op. at 5–7; *Alpha Beta*, 273 N.L.R.B. at 1547–48. In accepting the validity of the *Alpha Beta/Postal Service* regime, Local 520 effectively concedes the validity of the Board's policy of giving deference to pre-arbitration grievance settlements where the four criteria set forth above are met.

5. *See also* Edwards, *Deferral to Arbitration and Waiver of the Duty to Bargain: A Possible Way Out of Everlasting Confusion at the NLRB,* 46 OHIO ST. L.J. 23, 27–32, 36–40 (1985).

Certain statutory rights may not be waived through collective bargaining. These include, *inter alia,* the free choice of a bargaining representative, the Act's prohibitions on "hot cargo" agreements and secondary boycotts, the statutory bar against "closed shops," and hiring hall practices that give preference to union mem-

bers. *See id.* at 30–31; CHARLES J. MORRIS, THE DEVELOPING LABOR LAW 865 (2d ed.1983).

6. Because "the grievance-arbitration procedure forms an integral part of the collective-bargaining process," *Metropolitan Edison Co.,* 460 U.S. at 708, 103 S.Ct. at 1477, a union's power to waive statutory rights during the grievance process is commensurate with its power to waive such rights during negotiation of a collective bargaining agreement.

The concessions made by Local 520 are hardly surprising, for a Board policy of granting deference to grievance settlements seems plainly consistent with the NLRA. We have long recognized that the Board "does not abdicate its responsibilities to implement the National Labor Relations Act by respecting peaceful resolution of disputes through voluntarily agreed upon administrative techniques." *Associated Press v. NLRB*, 492 F.2d 662, 667 (D.C.Cir.1974); *see also Local Union No. 2188, Int'l Bhd. of Elec. Workers v. NLRB*, 494 F.2d 1087, 1090 (D.C.Cir.) (same), *cert. denied*, 419 U.S. 835, 95 S.Ct. 61, 42 L.Ed.2d 61 (1974). On this basis, we have expressed approval of the Board's *Spielburg* deference policy in several cases. *See, e.g., Bakery, Confectionery & Tobacco Workers Int'l Union 25*, 730 F.2d at 814–15; *American Freight*, 722 F.2d at 832–33; *Bloom v. NLRB*, 603 F.2d 1015, 1019–20 (D.C.Cir.1979); *Associated Press*, 492 F.2d at 666–67. Most recently, in *Hammontree v. NLRB*, 925 F.2d 1486 (D.C.Cir.1991) (en banc), we upheld the Board's *Collyer* "deferment" policy,[7] pursuant to which the Board requires a complaining party, under specified circumstances, to exhaust available grievance procedures before pursuing an unfair labor practice charge. In *Hammontree*, the court held that the Board's policy furthered the NLRA's policy of encouraging private dispute resolution and did not otherwise contravene the federal labor laws. *See id.* at 1494, 1496.

Consistent with these cases, we can find nothing to indicate that the Board's policy of granting deference to pre-arbitration grievance settlements constitutes an impermissible interpretation of the NLRA where, as in this case, the statutory right implicated by the grievance is within the class of "waiveable" rights. *See Metropolitan Edison Co.*, 460 U.S. at 705–07, 103 S.Ct. at 1475–77 (discussing "waiveable" rights); *Energy Coop., Inc.*, 290 N.L.R.B. 635, 636 (1988) (same). Pre-arbitration grievance settlements, like the arbitration awards at

issue in *Bloom* and *American Freight*, represent a consensual resolution of labor-management disputes through the collective bargaining process. By recognizing the validity and finality of settlements, the Board promotes the integrity of the collective bargaining process, thereby effectuating a primary goal of the national labor policy. *See Metropolitan Edison Co.*, 460 U.S. at 704, 103 S.Ct. at 1475 (in enacting labor laws, Congress sought "to ensure the integrity of th[e] [collective bargaining] process"); *Hammontree*, 925 F.2d at 1502 (Edwards, J., concurring) ("[T]he NLRA and the LMRA [Labor Management Relations Act] are designed to protect both individual and collective rights, and have as their paramount goal the promotion of labor peace through the collective efforts of labor and management."). At least where a grievance implicates only "waiveable" rights, we find nothing in the NLRA that prevents the Board from showing deference to a pre-arbitration grievance settlement. Thus, we have no trouble in finding that a policy of deference is rational and consistent with the NLRA, and, therefore the Board is entitled to deference from this court with respect to the adoption of such a policy. *See United Food & Commercial Workers Union, Local 23*, 484 U.S. at 123, 108 S.Ct. at 420–21.

### B. *Application of the Deference Policy in this Case*

Having determined that the Board's *general policy* of granting deference to pre-arbitration settlements is permissible, we now turn to the question of whether the Board abused its discretion in applying the policy in the instant case. As discussed above, the Board gives deference to grievance settlements under *Alpha Beta* and *Postal Service* where the grievance procedure through which the settlement is reached is "fair and regular," all parties agree to be bound, the result reached is not "palpably wrong" under the NLRA and the unfair labor practice issue was "con-

---

7. *See Collyer Insulated Wire*, 192 N.L.R.B. 837 (1971); *see also* note 1, *supra* (explaining *Collyer* policy).

sidered" by the parties, *i.e.*, the statutory and contractual issues are factually parallel and the parties were generally aware of the relevant facts. *Postal Service*, slip op. at 5–7; *Alpha Beta*, 273 N.L.R.B. at 1547–48. Local 520 argues that none of these four deference criteria is satisfied in the instant case. Contrary to Local 520's assertions, we find that the record contains substantial evidence to support the Board's conclusion that each criterion has been met.

■ First, Local 520 argues against deference on the ground that the GPC process was not "fair and regular" because, among other things, Berry was not permitted to be present at the GPC meeting, the presentation made by Mr. Coyne on his behalf was inadequate and no written opinion was issued by the GPC. We reject Local 520's contentions. The record demonstrates that Berry's case was fully discussed by representatives of the United Association and Catalytic prior to the GPC meeting. It is true that Berry was not present at the GPC meeting; but this is hardly a fatal flaw in the process. The *parties* to the agreement—not individual employees in the unit—are the ones who must create and administer the grievance procedure under the collective bargaining contract. Thus, within the bounds of the duty of fair representation, individual employees in the bargaining unit are properly subject to the judgment of their union agents in the processing of grievance claims. This is neither surprising nor unfair, for the union is the signatory to the agreement and thus is responsible for enforcing it. In other words, the employer is bound to bargain only with the employees' agent, not with each and every employee in the unit.

■ Even if either the Board or this court had the authority to second-guess the union's processing of the grievance in this case, there is nothing suspect on this record. Mr. Coyne was briefed on Berry's case by Mr. DeLuca and apparently received summaries of the two prior meetings at the United Association headquarters in Washington (the initial interview with Berry and the "Step Two" meeting). There is no evidence that Coyne's presentation to the GPC was inadequate or that it somehow unfairly characterized Berry's claim. Nor is the lack of a written opinion by the GPC dispositive. *Cf. United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 598, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960) ("Arbitrators have no obligation to the court to give their reasons for an award."); *Bloom*, 603 F.2d at 1020–21 (deference appropriate despite fact that arbitration panel's decision not set out in detailed written form). The crucial fact here is that the grievance procedure agreed to by the parties was lawful and was followed in this case; the Board was not required to decline to show deference merely because the petitioner would have preferred a different grievance process.

■ Next, Local 520 argues that all parties did not agree to be bound by the settlement agreement because both it and Berry objected to the terms of the settlement.[8] This argument is unavailing. The United Association, and not Local 520, is Berry's recognized bargaining representative. Absent a breach of the duty of fair representation, the United Association was empowered to bind Berry to the result obtained through the grievance process. *See Metropolitan Edison Co.*, 460 U.S. at 705–07, 103 S.Ct. at 1475–77 (union may waive non-representational rights of unit employees); *Mahon*, 808 F.2d at 1345 (union empowered "to conclusively bind" unit employees to settlement limiting their backpay entitle-

---

8. The record clearly shows that the United Association and Catalytic agreed to the terms of the settlement, and Local 520 does not seriously contend otherwise. The GPPMA itself contemplates that when the GPC reaches agreement as to how a grievance will be resolved, and the employer accepts that resolution, the grievance is "settled" and there is no recourse to arbitration. *See* GPPMA at 10 (arbitration available "[i]n the event agreement is not reached" by GPC and employer). Moreover, the United Association clearly viewed the grievance as settled—it responded to Hartinger's protest by stating that "[b]ecause of the agreement of the General Presidents' Committee, there is no further step as far as arbitration." Letter from Ed Moore, Assistant General President, United Association, to August Hartinger, Business Manager, Local 520 at 1 (Mar. 6, 1986), *reprinted in* App. 79.

ment "[w]holly apart from their own separate consents"); *Energy Coop., Inc.*, 290 N.L.R.B. at 637 (same). No claim is made here that the United Association breached its duty of fair representation in handling Berry's grievance, *see* Tr. at 51–53 (testimony of Mr. Hartinger); thus, the Board did not err in finding that the *relevant parties*, the United Association and Catalytic, properly agreed to be bound by the terms of the grievance settlement.

■ Third, and most strenuously, Local 520 claims that the Board erred in granting deference because the result reached by the settlement—Berry's reinstatement without backpay—is repugnant to the NLRA. Local 520 argues that because Berry was discharged for engaging in allegedly protected activity, Board precedent requires that he be given "make whole" relief. Since Berry received less than full relief, Local 520 contends, the settlement agreement was "palpably wrong" under the NLRA and the Board should not have given deference.

We reject this contention on several grounds. First, Local 520's "palpably wrong" argument presumes that this case presents an unfair labor practice issue apart from the contractual issue of whether Catalytic had "proper cause" for discharging Berry. This view has been categorically rejected by this court in *American Freight*, 722 F.2d at 831–32, where we found that *there was no separate statutory issue.* In *American Freight*, we held that where a provision in a collective bargaining agreement relating to the refusal of work assignments differed from an analogous NLRA provision, the parties' agreement constituted a waiver of the employee's statutory right; to have held otherwise, we noted, would have been to embrace

> [t]he obvious fallacy ... that there is a statutory issue apart from the contractual issue.... In other words, assuming, *arguendo*, that an individual employee has a right under the NLRA to refuse to work [in circumstances different from those prescribed in the agreement] ..., that alleged right was waived by the

collective bargaining agreement in this case.

*Id.* at 832; *see also* Edwards, *supra*, at 28 ("The parties' agreement, in essence, supplants the statute as the source of many employee rights in the context of collective bargaining."). In this case, then, the statutory right allegedly infringed—Berry's purported privilege to counsel unit employees to take action tantamount to a work stoppage—was merged into the "no-strike" and "proper cause" provisions of the GPPMA. As such, the result reached through the grievance procedure was, by definition, not "palpably wrong" under the NLRA because there was no separate statutory issue.

Furthermore, the Board granted deference to settlements providing less than make-whole relief in *Alpha Beta* and *Postal Service*, and Local 520 does not challenge the validity of those cases. *See Postal Service*, slip op. at 4, 7; *Alpha Beta*, 273 N.L.R.B. at 1546–47. Additionally, it is well-established that the NLRB's General Counsel may settle unfair labor practice charges prior to a hearing, even over the charging party's objection that the relief obtained is insufficient. *See, e.g., United Food & Commercial Workers Union, Local 23*, 484 U.S. at 118–21, 108 S.Ct. at 418–20; *see also* 29 C.F.R. §§ 101.7, 101.9 (1991) (regulations governing settlements). We see no significant difference between that accepted practice and the consequence of the deference policy applied in this case.

■ Lastly, Local 520 contends that the fourth *Alpha Beta/Postal Service* criterion is not met in this case because the unfair labor practice issue was not "considered" by the parties in reaching the settlement agreement. The short answer to this contention is that, because the GPPMA provided rules for evaluating the propriety of Berry's termination (the "proper cause" provision), there was no surviving unfair labor practice issue. Whatever rights Berry may have had under the NLRA were waived by the United Association in the collective bargaining agreement—and again at the settlement table—such that there was no separate statutory issue for

the parties or the GPC to "consider." *See American Freight*, 722 F.2d at 832–33.

In any event, using the Board's most recent test for the "considered" criterion, it is clear that the Board properly applied its deference policy in this case. In *Postal Service*, the NLRB held that the requirement that the parties to a settlement "consider" the unfair labor practice issue is satisfied where "the contractual issue and the unfair labor practice issue are factually parallel, and the parties were generally aware of the facts relevant to resolving the unfair labor practice [issue]." *Id.*, slip op. at 7. In this case, the issue under both the GPPMA and the NLRA was whether Catalytic was justified in terminating Berry based upon his alleged insubordination. Berry's defense on his contract claim was the same as his position on the unfair labor practice issue—that he was just following the instructions of Hartinger, the union Business Manager. As such, the same operative facts underlay both issues and the "considered" leg of the deference inquiry is satisfied. *Cf. Bloom*, 603 F.2d at 1020–21 (contract and unfair labor practice issues factually parallel where both turned on whether employee's action was justified).

Local 520 argues, however, that even if the contractual and unfair labor practice issues were factually parallel, the "considered" criterion is not met because the United Association specifically disclaimed any intention of resolving the statutory issue. Local 520 points to Mr. DeLuca's testimony at the ALJ hearing that when Ed Moore of the United Association's central office learned that Local 520 had filed an unfair labor practice charge on Berry's behalf, he informed DeLuca that the matter was "out of their [the United Association's] hands now because the case had been filed before the ... National Labor Relations Board." Tr. at 295. Local 520's contention is simply wrong as a factual matter. The transcript reveals that at the time when the United Association learned that the NLRB charge had been filed, the "Step Two" meeting recently had been held and the United Association was optimistic that the Berry matter might be resolved without recourse to Step Three of the GPPMA

grievance process. Mr. DeLuca testified that upon learning that the NLRB had become involved, the United Association concluded that the matter was "out of their hands"—*i.e.*, that resolution at the more informal second step of the grievance process would not be possible—and that "it [the Berry grievance] would just have to go to step three." *Id.; see also* ALJ Decision at 4. Indeed, the United Association subsequently took the Berry grievance to Step Three and presented his case to the GPC. Thus, the record belies Local 520's claim that the United Association disclaimed responsibility for the unfair labor practice issue, or any other part of the Berry matter.

In sum, we find substantial evidence in the record to support the Board's conclusion that the four *Alpha Beta/Postal Service* deference criteria are satisfied in this case. The first two criteria clearly are met because the GPPMA grievance procedure was "fair and regular" and the *relevant* parties—the United Association and Catalytic—agreed to be bound by the terms of the settlement. To the extent that the third and fourth criteria are relevant, *see American Freight*, 722 F.2d at 832–33, the record supports the conclusion that they also are satisfied. We therefore conclude that the Board did not abuse its discretion by granting deference to the settlement agreement; accordingly, the petition for review must be denied.

### C. The Theoretical Underpinnings of the Board's Deference Policy

Although we deny Local 520's petition for review, we are compelled to express concern over the Board's apparent lack of a coherent theory for its *Alpha Beta/Postal Service* deference policy. In *Darr v. NLRB*, 801 F.2d 1404 (D.C.Cir.1986), we vacated an order in which the Board had given deference to an arbitration award that was seemingly inconsistent with Board precedent. *Id.* at 1407–09. We reached this result primarily because the Board had failed to provide a coherent theory supporting its decision to give deference. We noted that the Board's decision might have

been justifiable under the contractual waiver doctrine approved by this court in *American Freight;* but because the Board had failed clearly to espouse that, or any other, theory of deference, we remanded the case for further consideration. *See Darr,* 801 F.2d at 1408–09. Although remand is not necessary in this case, the Board's decision—and the explanation of the decision provided by the Board's counsel at oral argument—provide us with little comfort that the doctrinal difficulties identified in *Darr* have been resolved.

Of special concern in this case is the so-called "palpably wrong" criterion for deference. In *Alpha Beta* and *Postal Service,* the Board stated that, in the settlement context, the "palpably wrong" criterion is satisfied so long as both parties to the settlement make concessions.[9] *See Postal Service,* slip op. at 7; *Alpha Beta,* 273 N.L.R.B. at 1547–48. At oral argument, counsel for the Board was unable to give a persuasive rationale for the "concessions" test.

The "concessions" test under the "palpably wrong" criterion makes no sense if the underlying theory of the Board's deference policy is the contractual waiver doctrine, as appears to be the case. *See Postal Service,* slip op. at 5–6 (appearing to apply waiver theory); *cf. Darr,* 801 F.2d at 1408 (noting that Board's *Spielburg* deference policy "seems to partake" of waiver theory). Under the contractual waiver doctrine, the Board could *never* give deference to a settlement with respect to a "non-waiveable" statutory right—such as the employees' choice of a bargaining representative, the NLRA's prohibitions against "closed shops" and secondary boycotts, and the like. Because a union and an employer may not legally bargain about non-waiveable matters, the Board could not, consistent with the NLRA, give deference to a settlement which implicated such rights.

On the other hand, where the statutory right implicated by a grievance settlement is within the category of "waiveable" rights—*e.g.,* economic issues, the right to strike, matters of selective discipline and the like—then it is unclear why the Board *would ever have any choice but to give deference,* at least so long as the grievance procedures through which the settlement is reached are fair and regular and the union has not breached its duty of fair representation. In other words, since a union has broad discretion to alter or modify employees' "waiveable" rights through collective bargaining, *see Metropolitan Edison Co.,* 460 U.S. at 705–07, 103 S.Ct. at 1475–77, we see no basis upon which the Board legitimately could intervene merely because the settlement reached by the union and the employer was not to the Board's liking. As the courts have recognized in the refusal to bargain context, the Board has no generalized authority to command settlements or force parties to agree to contractual terms that meet with the Board's approval. *See H.K. Porter Co. v. NLRB,* 397 U.S. 99, 106, 90 S.Ct. 821, 825, 25 L.Ed.2d 146 (1970) (" '[T]he Board may not, either directly or indirectly, compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements.' " (quoting *NLRB v. American Ins. Co.,* 343 U.S. 395, 404, 72 S.Ct. 824, 829, 96 L.Ed. 1027 (1952))); MORRIS, *supra,* at 705, 849 (same); *cf. Fournelle v. NLRB,* 670 F.2d 331, 341 (D.C.Cir.1982) (holding that, in the context of selective discipline, "the Board should not attempt ... to meddle with the legitimate products of the collective bargaining process").

In short, we are at a loss to discern either the theoretical underpinnings of the "palpably wrong" criterion, or the standards that the Board purports to follow in applying it. Indeed, the current formulation of the criterion seems designed to per-

---

**9.** In finding the settlement agreement in *Alpha Beta* not to be "palpably wrong," the Board appears to have placed some weight on the fact that the settlement was negotiated "within the context of the agreed-upon grievance/arbitra-

tion procedures." *Alpha Beta,* 273 N.L.R.B. at 1547. Of course, to the extent that the use of the grievance process is a part of the "palpably wrong" test, that factor is merely redundant of the first deference criterion.

mit the Board to give deference when it approves of the result of a settlement, but to intervene when it does not, with no apparent standards for judgment.[10] Such an approach gives the parties no clear indication as to what kinds of settlements will be found to be "palpably wrong" in a given case. A cynical observer might be inclined to view this approach as a veritable recipe for arbitrary action.

In this case, we need go no further than to highlight the logical inconsistencies in the current formulation of the Board's deference policy. Local 520 does not contest the validity of the policy, and its application here was clearly permissible because, as Local 520 concedes, the statutory right at issue in Berry's case was within the category of "waiveable" rights. However, we urge the Board to give serious consideration to the logical flaws in its current policy and to attempt to develop a comprehensible theory of deference. As *Darr* indicates, our patience with the Board's failure to develop a coherent theory of deference is not limitless, and the Board's continued recalcitrance may well result in reversal in future cases less clear-cut than the one before us today.

### III. Conclusion

For the reasons stated above, we deny Local 520's petition for review of the Board's decision and order. However, because the decision under review demonstrates the Board's continued failure to articulate a coherent theory for its deference

policy, we urge the Board to clarify its position in future cases.

*So Ordered.*

---

10. At oral argument, counsel for the Board explained the rationale of the "palpably wrong" criterion as follows:

 [T]he Board is in a situation in which it has statutorily the responsibility of preventing and prosecuting unfair labor practices; it also has, in the statute, ... a national policy favoring the private resolution of disputes [through] settlements.... I think there is some room for a case-by-case analysis.

 \* \* \* \* \* \*

 The Board is, in a sense, in the middle here. It has a responsibility ... to protect employee rights by retaining jurisdiction and withholding its processes and then applying its judgment to settlement agreements [and] to arbi-

tration awards, and to set forth standards to review those. This satisfies both roles of the Board in order to foster the national policy favoring private dispute settlements as well as to fulfill its responsibility [to protect employees].

We see no way to interpret these rather opaque remarks except to conclude that the Board will intervene under the "palpably wrong" criterion when it dislikes a settlement but will stay its hand when the terms of the settlement meet with its approval. The problem is that there is no way to determine what—apart from the whim of the Board—will influence a judgment to approve or disapprove a settlement.